**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL VERDUGO, brother of
Decedent; ROSEMARY VERDUGO,
mother, successor and heir of Mary
Ann Verdugo, Decedent,
*Plaintiffs-Appellants*,

v.

TARGET CORPORATION, a Minnesota
corporation,
*Defendant-Appellee.*

No. 10-57008

D.C. No.
2:10-cv-06930-
ODW-AJW

OPINION

Appeal from the United States District Court
for the Central District of California
Otis D. Wright II, District Judge, Presiding

Argued May 7, 2012
Submitted October 28, 2014
Pasadena, California

Filed October 28, 2014

Before: Harry Pregerson, Susan P. Graber,
and Marsha S. Berzon, Circuit Judges.

Per Curiam Opinion;
Separate Opinion by Judge Pregerson

## SUMMARY[*]

### California Law

After the California Supreme Court answered a question that was certified by the panel, the panel affirmed the district court's dismissal of a case, and held that Target Corporation, a commercial property owner, had no common law duty to provide an Automatic External Defibrillator in its stores for use in a medical emergency.

Judge Pregerson wrote separately to express his hope that Target will recognize its moral obligation to make Automatic External Defibrillators available for use in a medical emergency, and that the California legislature will take a hard look at the issue.

### COUNSEL

David Griffith Eisenstein, David G. Eisenstein Law Offices, Carlsbad, California; Robert A. Roth, Tarkington, O'Neill, Barrack & Chong, Berkeley, California, for Plaintiffs-Appellants.

Ryan Moore Craig and Benjamin R. Trachtman, Trachtman & Trachtman, Mission Viejo, California; Donald Manwell Falk and Richard Caldarone, Mayer Brown LLP, Palo Alto, California, for Defendant-Appellee.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

PER CURIAM:

Mary Ann Verdugo was shopping with her mother and brother in a Pico Rivera, California, Target when she experienced sudden cardiac arrest. There was no Automatic External Defibrillator ("AED") in the store, and by the time paramedics arrived, Verdugo had died. Verdugo's family sued Target, alleging that as a commercial property owner, Target had a common law duty to maintain an AED onsite. Ruling that Target had no such duty, the district court dismissed the Verdugos' claim. The Verdugos appealed to this court.

We determined that California law did not clearly answer the question whether Target was required to have AEDs in its stores and viewed "the California Supreme Court [as] better positioned to address [this] major question[] of California tort law than this court." *Verdugo v. Target Corp.*, 704 F.3d 1044, 1046 (9th Cir. 2012). Accordingly, we certified a question to the California Supreme Court pursuant to Rule 8.548 of the California Rules of Court. *Id.* at 1045. That court construed the certified question as follows: "[W]hether, under California law, the common law duty of reasonable care that defendant Target Corporation (Target) owes to its business customers includes an obligation to obtain and make available on its business premises an automated (or automatic) external defribrillator (AED) for use in a medical emergency." *Verdugo v. Target Corp.*, 59 Cal. 4th 312, 316 (2014).

The California Supreme Court has answered the restated certified question as follows: "[U]nder California law,

Target's common law duty of care to its customers does not include a duty to acquire and make available an AED for use in a medical emergency." *Id.* at 317. A copy of the California Supreme Court's opinion is attached as an appendix to this opinion. We said that we would follow the California Supreme Court's guidance, 704 F.3d at 1050, and we do. The district court's ruling that Target had no common law duty to provide an AED in its store is consistent with the California Supreme Court's answer to the certified question, and so we **AFFIRM**.

PREGERSON, Circuit Judge, writing separately:

The California Supreme Court has spoken. This decision holds that "under California law, Target's common law duty of care to its customers does not include a duty to acquire and make available an AED for use in a medical emergency." *Verdugo v. Target Corp.*, 59 Cal. 4th 312, 317 (2014). And so, in this diversity case, that holding controls. But that decision troubles me. Therefore, I write separately hoping that big box stores like Target will, at the very least, recognize their moral obligation to make AEDs available for use in a medical emergency. Should that not come to pass, I hope that our California Legislature takes a hard look at this issue and considers a statutory standard of care that will protect consumers by requiring big box stores to make life-saving AEDs available.

Stores like Target have a "special relationship" with their business invitees. This special relationship creates an affirmative duty that requires a business to provide first aid to invitees who become ill or injured on the premises, and "to

care for them until they can be cared for by others."
Restatement (Second) of Torts § 314A. I believe that AEDs
should be considered first aid. They are crucial to the
survival of sudden cardiac arrest victims. They are
inexpensive, nearly foolproof, and are necessary when, as
happened here, paramedics cannot reach a victim in time to
save the person's life. I believe that AEDs should be as
common as first aid kits, and that big box stores like Target
should be required to make them available to their customers
who suffer sudden cardiac arrest.

About 360,000 Americans are treated by emergency
medical services for sudden cardiac arrest before reaching a
hospital. *See Verdugo*, 59 Cal. 4th at 319. "Less than 10
percent of those victims survive." *Id.* Victims of sudden
cardiac arrest collapse and quickly lose consciousness—often
without warning. Sudden cardiac arrest is treatable, but time
is of the essence when the life of a sudden cardiac arrest
victim is in the balance: "every minute that passes before
returning the heart to a normal rhythm decreases the chance
of survival by 10 percent." *See* Cardiac Arrest Survival Act
of 2000, Pub. L. No. 106-505, § 402(5), 114 Stat. 2314
(2000).

There is good reason for big box stores like Target to be
equipped with AEDs: they save lives. The high percentage of
death due to sudden cardiac arrest can be reduced by the
quick use of a defibrillator. When "CPR and AEDs are used
within three to five minutes from the onset of collapse, the
survival rate of a sudden cardiac arrest victim is as high as 50
to 70 percent." *Automatic External Defibrillators: Hearing
on S.B. 1436 Before the S. Comm. on Health*, 2011–2012
Reg. Sess. 1–2 (Cal. 2012). Yet, big box stores like Target
are currently not required by the State of California to have

available thse life-saving devices for their patrons.  But big box stores are not prevented from making a voluntary choice to do so.

Not only is the use of an AED the most effective way to reduce death due to sudden cardiac arrest, but AEDs are also relatively inexpensive.  Target used to sell Phillips HeartStart AEDs on its website for about $1,200.  Although Target has removed the product from its website, these devices can still be obtained for similarly inexpensive prices elsewhere.  *See e.g.*, http://www.heartsmart.com/philips-heartstart-onsite-aed-package-p/bus-pkg-onsite.htm (selling the Phillips HeartStart AED for $1,199) (last visited Oct. 16, 2014); http://phss.redcross.org/aedoffers/ (offering several different brands of defibrillators) (last visited Oct. 16, 2014).

Moreover, modern AEDs are nearly foolproof even without training.  One study in *Circulation*, the American Heart Association journal, showed that untrained sixth graders safely and properly used AEDs and took only slightly longer than emergency-trained personnel to deliver the defibrillator shock.  *See* John W. Gundry et al., *Comparison of Naive Sixth-Grade Children with Trained Professionals in the Use of an Automated External Defibrillator*, 100 Circulation 1703 (1999).  Because little training is involved, and many of the devices provide audio step-by-step instructions, it would not be difficult for big box stores to provide the minimum training required to qualify for immunity from liability under California law.  *See* Cal. Health & Safety Code § 1797.196.

Big box stores in particular should be required to equip their stores with AEDs.  The sheer size of these stores increases the time for paramedics to reach a sudden cardiac

arrest victim, making quick access to an AED of paramount importance. Mary Ann Verdugo died in the Pico Rivera Target store in part because the paramedics could not get to her inside the store in time to administer an AED. It is obvious why paramedics would have a hard time getting to the Target location and navigating inside the store within the five minute time window—the average size of a Target store is 135,000 square feet. *See* Press Release, Target Corporation, Target to Open TargetExpress Small-Format Store in San Diego (Sept. 18, 2014), *available at* http://pressroom.target.com/news/target-to-open-targetexpress-small-format-store-in-san-diego (last visited Oct. 16, 2014). Thus, if another customer suffers sudden cardiac arrest in a big box store like Target, the probability of her survival falls significantly if there is no access to a defibrillator in the store.

Many states, including California, have examined this issue and developed public policies promoting AED use, including expanding civil immunity to businesses that have installed AEDs and meet certain statutory requirements. *See* Kevin M. Rodkey, *Medical Technology Meets the Maryland General Assembly: A Case Study in Handling Advances in Automated External Defibrillator Technology*, 12 J. Health Care L. & Pol'y 81 (2009). However, California's immunity statute does not require businesses to install and maintain AEDs, despite all the reasons why AEDs are crucial first aid equipment for sudden cardiac arrest victims.

Yet at least one state—Oregon—has enacted a statute that requires big box stores to have an AED. The Oregon statute provides that a "place of public assembly," meaning "a single building that has 50,000 square feet or more of indoor floor space and where . . . [t]he public congregates for purposes

such as . . . shopping, . . . [and a]t least 50 individuals congregate on a normal business day" is required to "have on the premises at least one [AED]."  ORS § 431.690.  Upon enacting the law, one Oregon State Senator called AEDs "the fire extinguishers of the 21st century—the sooner more are available in public places, the more lives we can save."  News Release, Senate Majority Office, Expanded Access to Defibrillators Wins Senate Support, Oregon State Legislature (OR Legis. News Rel., 4/28/2009).

If Oregon can require businesses such as big box stores to provide this minimally burdensome, yet life-saving equipment, so too can California, a leader in consumer protection.  I implore the California Legislature to consider this issue.  I also hope that Target and other big box retailers will uphold their moral obligation to ensure the health and safety of their customers by voluntarily installing AEDs in their stores.

**APPENDIX**

SUPREME COURT
FILED

JUN 2 3 2014

Frank A. McGuire Clerk
_____
Deputy

C O P Y

# IN THE SUPREME COURT OF CALIFORNIA

MICHAEL VERDUGO et al., )
)
    Plaintiffs and Appellants, )
)          S207313
v. )
)   Ninth Cir. U.S. Ct. App.
)       No. 10-57008
TARGET CORPORATION, )
)      U.S. Dist. Ct.
    Defendant and Respondent. )  No. 2:10-cv-06930-ODW-AJW
_____ )

At the request of a three-judge panel of the United States Court of Appeals for the

Ninth Circuit, we agreed to address a question of state law that is potentially

determinative of an appeal now pending before that federal appellate court. (Cal. Rules

of Court, rule 8.548.) The question, as reformulated and narrowed to conform to the facts

of the pending appeal, is whether, under California law, the common law duty of

reasonable care that defendant Target Corporation (Target) owes to its business

customers includes an obligation to obtain and make available on its business premises an

automated (or automatic) external defibrillator (AED) for use in a medical emergency.[1]

_____

[1]     The question of state law, as submitted by the Ninth Circuit panel, was phrased in
broader terms, asking: "In what circumstances, if ever, does the common law duty of a
commercial property owner to provide emergency first aid to invitees require the
availability of an Automatic External Defibrillator ("AED") for cases of sudden cardiac
arrest?" (*Verdugo v. Target Corp.* (9th Cir. 2012) 704 F.3d 1044, 1045.) Because we do
not resolve abstract questions of law but rather address only issues that "are presented on

*(footnote continued on next page)*

SEE CONCURRING OPINION

Target maintains that recognition of a common law duty on its part to acquire and make available an AED for the use of its customers is inappropriate for two reasons. First, Target asserts that existing California statutes relating to the acquisition and use of AEDs preclude recognition of such a common law duty, either because one of the statutory provisions explicitly bars such a requirement or because the AED statutes as a whole "occupy the field" of AED regulation and thus implicitly foreclose California courts from recognizing such a common law duty. Second, Target argues that even if existing California AED statutes do not prohibit recognition of such a common law duty, generally applicable principles relating to the scope of a business's common law duty to its customers, set forth in governing California decisions, do not support recognition of such a duty.

For the reasons discussed hereafter, we conclude that existing California statutes relating to the acquisition and use of AEDs do not preclude this court from determining whether such a duty should be recognized under California common law, but that generally applicable principles and limitations regarding the existence of a common law duty that are embodied in past California decisions do not support recognition of such a common law duty. Accordingly, we conclude that, under California law, Target's common law duty of care to its customers does not include a duty to acquire and make available an AED for use in a medical emergency.

---

*(footnote continued from previous page)*

a factual record" (*Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 362), we have restated the issue to conform to the facts at issue in the underlying action. (See Cal. Rules of Court, rule 8.548(f)(5) ["At any time, the Supreme Court may restate the question . . ."].) The Ninth Circuit panel itself emphasized that its phrasing of the question was "not meant to restrict the California Supreme Court's consideration of the issue involved." (*Verdugo v. Target Corp.*, *supra*, at p. 1045.)

2

## I. Summary of Facts and Federal Court Proceedings

On August 31, 2008, Mary Ann Verdugo was shopping at a large Target department store in Pico Rivera, California, with her mother and brother when she suffered a sudden cardiac arrest and collapsed. In response to a 911 call, paramedics were dispatched from a nearby fire station. It took the paramedics several minutes to reach the store and a few additional minutes to reach Verdugo inside the store. The paramedics attempted to revive Verdugo but were unable to do so; Verdugo was 49 years of age at the time of her death. Target did not have an AED in its store.

After the incident, Verdugo's mother and brother (hereafter plaintiffs) filed the underlying lawsuit against Target, maintaining that Target breached the duty of care that it owed to Verdugo, a business customer, by failing to have on hand within its department store an AED for use in a medical emergency. Plaintiffs' first amended complaint alleged that an AED was an essential element of the life-saving first aid that Target was assertedly obligated to provide to its patrons. The complaint contended that in view of the large number of persons (300,000) in this country who suffer an unanticipated sudden cardiac arrest each year, and the large number of customers who shop in Target's department stores, it was reasonably foreseeable that a patron might suffer such an attack in its store, and that because of the size of the store Target should have known that it would take emergency medical personnel many minutes to reach a sudden cardiac arrest victim, making an onsite AED a medical necessity. Further, the complaint noted that AEDs are relatively inexpensive and that, in fact, Target itself sold AEDs over the Internet for approximately $1,200. The complaint maintained that "[t]he inexpensive availability of AEDs and their ease of use with even minimal or no advance training have led to on-site CPR [cardiopulmonary resuscitation] and AED assistance to now be an expected part of first aid response." Asserting that Target's failure to provide an AED was a substantial cause of Verdugo's death, plaintiffs sought to recover damages from Target.

3

Plaintiffs filed their initial complaint in the Los Angeles County Superior Court, but Target removed the proceeding to federal district court. Thereafter, Target filed a motion to dismiss the matter on the ground that the complaint failed to state a cause of action. (Fed. Rules Civ. Proc., rule 12(b)(6), 28 U.S.C.) After briefing, the federal district court granted Target's motion, concluding that Target had no duty to acquire and make available an AED for the use of its customers. Plaintiffs appealed to the Ninth Circuit Court of Appeals, arguing that the federal appellate court should recognize that a duty to provide an AED does exist under California common law, or, in the alternative, asking that court to certify to this court the question of state law regarding the existence of such a duty under California common law. Target opposed certification, but, after oral argument, the three-judge panel, by a two-to-one vote, determined that California precedents do not provide sufficient guidance to answer the question of California tort law presented by the case and asked this court to address the issue. (*Verdugo v. Target Corp., supra*, 704 F.3d at p. 1045.)[2]

In response to the Ninth Circuit's request, we agreed to address the state law issue presented by the pending appeal. We have received extensive briefing in this matter, both by the parties and by numerous amici curiae, some supporting plaintiffs and others supporting defendant Target.

---

[2]    The majority opinion of the Ninth Circuit three-judge panel, certifying the question of state law to this court, was authored by Judge Berzon and concurred in by Judge Graber. Judge Pregerson dissented, concluding that "the California common law duty for a business to provide emergency first aid to its invitees requires the availability of an AED for cases of sudden cardiac arrest." (*Verdugo v. Target Corp., supra*, 704 F.3d at p. 1053 (dis. opn. of Pregerson, J.).) The dissent would have reversed the district court's dismissal of the action and remanded the matter for further proceedings. (*Ibid.*) Judge Graber filed a separate concurring opinion, noting that in the absence of this court's guidance on the issue she would disagree with the dissenting judge's view, but that "because reasonable minds differ about the state law that we must apply, certification is particularly appropriate here." (*Id.* at p. 1051 (conc. opn. of Graber, J.).)

4

## II.  Brief Overview of Sudden Cardiac Arrest and AEDs

To place the issue before us in perspective, it is useful at the outset to briefly describe the nature and scope of the health problem posed by sudden cardiac arrest and the development of AEDs as one important tool for addressing this problem.  Thereafter, we describe the current California statutes relating to AEDs.  (*Post*, pt. III.)

In a 2013 publication, the American Heart Association stated that "Cardiac arrest is a leading cause of death in the United States.  Each year, emergency medical services (EMS) treats about 360,000 victims of cardiac arrest before they reach the hospital.  Less than 10 percent of those victims survive.  Cardiac arrest can happen to anyone at any time. . . ."  (Amer. Heart Assn., Implementing an AED Program (July 2013) p. 3 [corporate training] <http://www.heart.org/cpr> [as of OPN FILE DATE].)  The publication explained:  "Cardiac arrest is the abrupt loss of heart function in a person who may or may not have heart disease.  The time and mode of death are unexpected.  Cardiac arrest occurs instantly or shortly after symptoms appear.  [¶]  Most cardiac arrests are due to abnormal heart rhythms called arrhythmias.  A common arrhythmia is ventricular fibrillation, in which the heart's electrical impulses suddenly become chaotic and ineffective.  Blood flow to the brain stops abruptly; the victim then collapses and quickly loses consciousness.  Death usually follows unless a normal heart rhythm is restored within minutes."  (*Ibid.*)

The publication further explained:  "Defibrillation is a process in which an electronic device gives an electrical shock to the heart.  Defibrillation stops ventricular fibrillation by using an electrical shock and allows the return of a normal heart rhythm.  A victim's chance of survival decreases by 7 to 10 percent for every minute that passes without defibrillation."  (Amer. Heart Assn., Implementing an AED Program, *supra,* at p. 4.)

Beginning in the 1990s, small portable defibrillators, called automated or automatic external defibrillators, became commercially available.  As described in

5

another American Heart Association publication, "AEDs are highly accurate, user-friendly computerized devices with voice and audio prompts that guide the user through the critical steps of operation. AEDs were designed for use by lay rescuers and first responders to reduce time to defibrillation for victims of [ventricular fibrillation] sudden cardiac arrest. The rescuer turns the AED on and attaches it to the victim with adhesive electrodes or pads. The AED records and analyzes the victim's cardiac rhythm. If a shock is indicated, the AED charges to the appropriate energy level and prompts the rescuer to deliver a shock. If the device is fully automated and a shock is indicated, the AED can deliver a shock without further action by the rescuer." (Amer. Heart Assn., *Community Lay Rescuer Automated External Defibrillation Programs* (2006) 113 Circulation 1260, 1261, fn. omitted (*Community AED Programs*) <http://circ.ahajournals.org/content/113/9/1260.full> [as of OPN FILE DATE].)[3]

---

[3]     This article further explains: "Although AEDs are user friendly and the steps in their operation are often intuitively obvious, the effectiveness of an AED for cardiac arrest requires more than simple operation. The rescuer must know when to use an AED (i.e., recognize cardiac arrest), how to operate it, how to troubleshoot it (e.g., a hairy or sweaty chest may prevent good contact between the skin and electrode pads), and how to combine AED use with CPR [cardiopulmonary resuscitation]. [¶] CPR remains a critical component of a successful AED program for several reasons. First, the rescuer must recognize sudden cardiac arrest (i.e., the victim is unresponsive and not breathing). Because immediate bystander CPR improves survival from [ventricular fibrillation] sudden cardiac arrest, the rescuer should be able to perform CPR until the AED is available and after a shock ends [ventricular fibrillation]. . . . The efficient integration of CPR with AED use requires training and frequent practice. . . . [¶] . . . [¶] [Second, i]t is important to note that few victims with [ventricular fibrillation] cardiac arrest demonstrate an organized rhythm at 60 seconds after elimination of [ventricular fibrillation] by shock. Many demonstrate pulseless electrical activity in the first minutes after successful defibrillation. The victim of [ventricular fibrillation] cardiac arrest requires CPR until the heart is able to pump blood effectively." (*Community AED Programs*, *supra*, 113 Circulation at pp. 1265-1266, fns. omitted.)

6

In the mid-1990s, the American Heart Association began a national public health initiative to educate the public and lawmakers regarding the significant problem posed by sudden cardiac arrest and to promote increased acquisition and use of AEDs by nonmedical entities. The initiative included the drafting of model so-called Good Samaritan AED legislation that would grant legal immunity under specified circumstances to nonmedical entities and individuals who acquired, made available, or used AEDs for emergency care. The American Heart Association AED initiative proved very successful. Between 1995 and 2000, all 50 states passed laws and regulations related to lay rescuer AED programs. (*Community AED Programs*, *supra*, 113 Circulation at p. 1261.) Since 2000, most states have revisited their initial AED statutes and regulations, seeking to continue to reduce legal impediments to the voluntary acquisition and use of AEDs and, in some instances, mandating the provision of AEDs in specified settings. (See Nat. Conf. of State Legislatures, State Laws on Cardiac Arrest and Defibrillators (Jan. 2013) [listing state laws] <http://www.ncsl.org/issues-research/health/laws-on-cardiac-arrest-and-defibrillators-aeds.aspx> [as of OPN FILE DATE].)

### III. Current California AED Statutes

#### A. General California AED statutes — Civil Code section 1714.21 and Health and Safety Code section 1797.196

The initial California statutory provisions relating specifically to the use of AEDs in nonmedical settings were enacted in 1999, in apparent response to the American Heart Association's nationwide campaign. The 1999 legislation added two statutory provisions relating to AEDs — Civil Code section 1714.21 and Health and Safety Code section 1797.196. (Stats. 1999, ch. 163, §§ 1-3, pp. 2069-2070.) These two statutes have been amended several times since 1999 and continue to constitute the primary, generally applicable California statutes relating to AEDs.

7

Civil Code section 1714.21 is one of a number of California Good Samaritan statutes that, in order to encourage individuals or entities to gratuitously undertake conduct or activities for the benefit of others, grant immunity from potential civil liability under specified circumstances.[4] Civil Code section 1714.21 currently provides immunity, under specified circumstances, to (1) persons who render emergency care or treatment by use of an AED, and (2) persons and entities that acquire an AED for emergency use. With respect to the first category — individuals who use an AED to render emergency care — section 1714.21, subdivision (b), currently provides broadly that "[a]ny person who, in good faith and not for compensation, renders emergency care or treatment by the use of an AED at the scene of an emergency is not liable for any civil damages resulting from any acts or omissions in rendering the emergency care."[5] With respect to the second category — individuals or entities that acquire an AED for emergency use — section 1714.21, subdivision (d), provides more narrowly that "[a] person or entity that acquires an AED for emergency use pursuant to this section is not liable for any civil damages resulting from any acts or omissions in the rendering of the emergency care by use of an AED, *if that person or entity has complied with subdivision (b) of Section 1797.196 of the Health and Safety Code*." (Italics added; see also Civ.

---

[4]    Other Good Samaritan statutes include Civil Code sections 1714.2 (use of CPR), 1714.22 (use of opiate overdose treatment), and 1714.25 (donations of food to nonprofit charities).

[5]    As originally enacted in 1999, Civil Code section 1714.21, subdivision (b) granted immunity to a person who rendered emergency care by use of an AED only if the person had completed a basic CPR and AED use course that complied with state regulations and with the standards of the American Heart Association or the American Red Cross. (Stats. 1999, ch. 163, § 2, p. 2069.) The immunity for users of an AED was broadened to its current state by a 2002 amendment. (Stats. 2002, ch. 718, § 1, p. 4233.)

8

Code, § 1714.21, subd. (e) [providing similarly limited immunity to "any person or entity responsible for the site where an AED is located"].)[6]

Health and Safety Code section 1797.196, subdivision (b), in turn, sets forth a substantial number of requirements that a person or entity that acquires an AED must comply with in order to be eligible for the immunity from civil liability afforded by Civil Code section 1714.21. Among other prerequisites, section 1797.196, subdivision (b), requires a person or entity that acquires an AED to (1) comply with all regulations governing the placement of an AED, (2) ensure that the AED is maintained and regularly tested, (3) check the AED for readiness after each use and at least once every 30 days, (4) ensure that any person who uses an AED alerts emergency medical services (EMS) as soon as possible, (5) provide AED training for at least one employee for every AED unit acquired (up to five AED units) and have a trained employee available during normal operating hours to respond to an emergency involving the use of an AED, (6) prepare a written plan of steps to be taken in the event of an emergency involving the use of an AED, (7) ensure that tenants in a building in which an AED is located annually receive a brochure describing the proper use of an AED and post similar information next to any installed AED, and (8) notify tenants at least once a year of the location of AED units in the building.[7] Only if an acquirer of an AED satisfies all these conditions does the

6    Other subdivisions of Civil Code section 1714.21 grant immunity to persons or entities who provide CPR and AED training (Civ. Code, § 1714.21, subd. (c)) and to physicians who are involved with the placement of an AED (*id.*, § 1714.21, subd. (e)), negate immunity if injury or death results from "gross negligence or willful or wanton misconduct" of the person using the AED (*id.*, § 1714.21, subd. (f)), and specify that nothing in section 1714.21 relieves "a manufacturer, designer, developer, distributor, installer, or supplier of an AED" of any liability "under any applicable statute or rule of law." (*Id.*, § 1714.21, subd. (g)).

7    Health and Safety Code section 1797.196, subdivision (b) currently provides in full: "In order to ensure public safety, any person or entity that acquires an AED is not liable for any civil damages resulting from any acts or omissions in the rendering of the

*(footnote continued on next page)*

9

*(footnote continued from previous page)*

emergency care under subdivision (b) of Section 1714.21 of the Civil Code, if that person or entity does all of the following:

"(1) Complies with all regulations governing the placement of an AED.

"(2) Ensures all of the following:

"(A) That the AED is maintained and regularly tested according to the operation and maintenance guidelines set forth by the manufacturer, the American Heart Association, and the American Red Cross, and according to any applicable rules and regulations set forth by the governmental authority under the federal Food and Drug Administration and any other applicable state and federal authority.

"(B) That the AED is checked for readiness after each use and at least once every 30 days if the AED has not been used in the preceding 30 days. Records of these checks shall be maintained.

"(C) That any person who renders emergency care or treatment on a person in cardiac arrest by using an AED activates the emergency medical services system as soon as possible, and reports any use of the AED to the licensed physician and to the local EMS agency.

"(D) For every AED unit acquired up to five units, no less than one employee per AED unit shall complete a training course in cardiopulmonary resuscitation and AED use that complies with the regulations adopted by the Emergency Medical Service Authority and the standards of the American Heart Association or the American Red Cross. After the first five AED units are acquired, for each additional five AED units acquired, one employee shall be trained beginning with the first AED unit acquired. Acquirers of AED units shall have trained employees who should be available to respond to an emergency that may involve the use of an AED unit during normal operating hours.

"(E) That there is a written plan that describes the procedures to be followed in the event of an emergency that may involve the use of an AED, to ensure compliance with the requirements of this section. The written plan shall include, but not be limited to, immediate notification of 911 and trained office personnel at the start of AED procedures.

"(3) When an AED is placed in a building, building owners shall ensure that tenants annually receive a brochure, approved as to content and style by the American Heart Association or American Red Cross, which describes the proper use of an AED, and also ensure that similar information is posted next to any installed AED.

"(4) When an AED is placed in a building, no less than once a year, building owners shall notify their tenants as to the location of AED units in the building.

"(5) When an AED is placed in a public or private K-12 school, the principal shall ensure that the school administrators and staff annually receive a brochure, approved as to content and style by the American Heart Association or the American Red Cross, that describes the proper use of an AED. The principal shall also ensure that similar

*(footnote continued on next page)*

10

acquirer qualify for the immunity from civil liability afforded by Civil Code section 1714.21.

In addition to setting forth the requirements that an acquirer of an AED must satisfy in order to obtain immunity from liability under Civil Code section 1714.21, Health and Safety Code section 1797.196 contains a separate subdivision — subdivision (f) — upon which defendant Target heavily relies in this case in maintaining that courts are precluded from determining whether California common law imposes upon Target a duty to acquire and make available an AED for use in a medical emergency. Section 1797.196, subdivision (f), provides in full: "Nothing in this section or Section 1714.21 of the Civil Code may be construed to require a building owner or a building manager to acquire and have installed an AED in any building." We discuss Target's legal argument relating to section 1797.196, subdivision (f), below. (See pt. IV.A., *post*.)

### B. AEDs and health studios — Health and Safety Code section 104113

In addition to the provisions of Civil Code section 1714.21 and Health and Safety Code section 1797.196 relating generally to the circumstances in which a nonmedical user or acquirer of an AED is immune from civil liability for any damage resulting from the use of an AED, California has enacted a specific statute relating to the particular obligations of health (or fitness) studios regarding AEDs.

---

*(footnote continued from previous page)*

information is posted next to every AED. The principal shall, at least annually, notify school employees as to the location of all AED units on the campus. The principal shall designate the trained employees who shall be available to respond to an emergency that may involve the use of an AED during normal operating hours. As used in this paragraph, 'normal operating hours' means during the hours of classroom instruction and any school-sponsored activity occurring on school grounds."

11

Health and Safety Code section 104113, initially enacted in 2005 (Stats. 2005, ch. 431, § 1, pp. 3552-3554), requires every "health studio" to acquire and maintain an AED and to train personnel on the use of AEDs.[8]  In addition to mandating the acquisition and maintenance of AEDs in health studios (Health & Saf. Code, § 104113, subd. (a)), section 104113 grants immunity to health studio employees for the use or nonuse of an AED for emergency care (*id.*, § 104113, subd. (b)), and grants immunity to the owners and managers of a health studio so long as the facility complies with a list of requirements set forth in section 104113, subdivision (e) (*id.*, § 104113, subd. (d)).  The requirements contained in section 104113, subdivision (e), generally parallel the general prerequisites that all acquirers of AEDs must comply with under Health and Safety Code section 1797.196, subdivision (b), in order to obtain immunity from civil liability, but section 104113, subdivision (e), also contains additional requirements applicable to those health studios that allow members access to the facility during times when the facility does not have an employee on the premises.  (*Id.*, § 104113, subd. (e)(3); see also *id.*, § 104113, subd. (g).)[9]

[8]     Health and Safety Code section 104113, subdivision (h), currently defines "health studio" for purposes of this section as "a facility permitting the use of its facilities and equipment or access to its facilities and equipment, to individuals or groups for physical exercise, body building, reducing, figure development, fitness training, or any other similar purpose, on a membership basis. 'Health studio' does not include a hotel or similar business that offers fitness facilities to its registered guests for a fee or as part of the hotel charges."

[9]     Like the immunity provisions of Civil Code section 1714.21, the immunity provisions of Health and Safety Code section 104113 do not apply in the case of gross negligence or willful or wanton misconduct. (Health & Saf. Code, § 104113, subd. (f).)

Health studios are currently the only nonmedical setting in which California statutes or regulations require that AEDs be provided.[10]

### C. AEDs in state buildings — Government Code section 8455

In addition to the foregoing statutes, California has enacted a statutory provision relating to the placement of AEDs in state-owned and state-leased buildings.

Government Code section 8455, enacted in 2004, directs the California Department of General Services to "apply for federal funds . . . for the purchase of automated external defibrillators to be located within state-owned and leased buildings" (§ 8455, subd. (a))[11] and also requires the Department of General Services to "develop and adopt policies and procedures relative to the placement and use of automated external defibrillators in state-owned and leased buildings and ensure that training is consistent with Section 1797.196 of the Health and Safety Code and the regulations adopted pursuant to that section." (Gov. Code, § 8455, subd. (b).)

Pursuant to this provision, AEDs have been installed in many state-owned and leased buildings throughout California.

---

[10]    Numerous California regulations require a variety of *medical facilities* to be equipped with a defibrillator along with other emergency medical equipment and devices. (See, e.g., Cal. Code Regs., tit. 22, §§ 70227 [surgical services], 70237 [anesthesia services], 70407 [acute respiratory services], 70417 [emergency medical services], 70457 [comprehensive emergency medical services], 79735 [outpatient surgical care], 79769 [standby emergency services]; Cal. Code Regs., tit. 16, § 1070.8 [training courses for dental sedation assistants].)

[11]    The enactment of Government Code section 8455 followed enactment of federal legislation in 2002 that authorized the United States Secretary of Health and Human Services to award federal grants to states and localities to develop and implement public access defibrillation programs, including the purchase of AEDs. The federal legislation appropriated $25 million for that purpose. (Community Access to Emergency Defibrillation Act of 2002, Pub.L. 107-188, § 159 (June 12, 2002) 116 Stat. 634 et seq., enacting 42 U.S.C. § 244.)

13

**IV.  Do the Current California Statutes Relating to AEDs Preclude Courts from Determining Whether Target's Common Law Duty of Care to Its Business Patrons Includes an Obligation to Provide an AED For Use in an Emergency?**

As already noted, Target argues that current California statutes preclude recognition of a common law duty to provide an AED on two separate theories:  first, that the statutes explicitly preclude recognition of a common law requirement to provide an AED, or, alternatively, that the current California statutes should be viewed as entirely "occupying the field" of AED regulation and thus implicitly preclude such a common law requirement.  We discuss each of these separate theories in turn.

**A.  Does Health and Safety Code section 1797.196, subdivision (f), explicitly preclude recognition of a common law requirement to provide an AED?**

Target initially contends that the Legislature's enactment of Health and Safety Code section 1797.196, subdivision (f), explicitly precludes recognition of a common law requirement to provide an AED.  As explained, we conclude that the provision does not support this contention.

Section 1797.196, subdivision (f) currently reads in full:  "Nothing in this section or Section 1714.21 of the Civil Code may be construed to require a building owner or a building manager to acquire and have installed an AED in any building."

Although this provision makes it clear that *the legislative enactment of Health and Safety Code section 1797.196 and Civil Code section 1714.21* was not intended, and may not be construed by California courts, to require a building owner or manager to acquire and install an AED in any building, the subdivision in question does not purport to address the separate and distinct question whether, and if so under what circumstances, California *common law* may embody a duty to acquire and make available an AED as part of the general common law duty of care owed by a business establishment to its patrons or customers.  It is well established under California law that a business establishment's legal obligations to its customers and others may arise not only from the Legislature's enactment of a statutory provision but also, alternatively, under the

14

common law.  (See, e.g., *City of Moorpark v. Superior Court* (1998) 18 Cal.4th 1143, 1147; *Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814, 822-824; *Coulter v. Superior Court* (1978) 21 Cal.3d 144, 152-154.)  Under the common law, the existence and scope of an individual's or entity's common law duty of reasonable care is dependent upon a variety of circumstances.  (See, e.g., *Rowland v. Christian* (1968) 69 Cal.2d 108, 113.)

Past California decisions recognize that "[a]s a general rule, '[u]nless expressly provided, statutes should not be interpreted to alter the common law, and should be construed to avoid conflict with common law rules.' " (*California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 297.)  "Accordingly, '[t]here is a presumption that a statute does not, by implication, repeal the common law. [Citation.]  Repeal by implication is recognized only where there is no rational basis for harmonizing two potentially conflicting laws.' " (*Ibid.*)  Although Health and Safety Code section 1797.196, subdivision (f), by its terms, establishes that Health and Safety Code section 1797.196 and Civil Code section 1714.21 themselves should not be interpreted to require building owners or managers to acquire and make available AEDs in their buildings (and thus should not be construed to render the failure to acquire an AED negligence per se pursuant to Evid. Code, § 669), nothing in subdivision (f) states or suggests that it was intended to preclude courts from applying ordinary common law principles in determining whether, either in general or under particular circumstances, a common law duty to provide an AED ought to be recognized.

In other contexts, the Legislature has used much clearer and more explicit statutory language when it has intended entirely to preclude the imposition of liability upon an individual or entity under common law principles for acting or for failing to act in a particular manner.  For example, after this court, in *Coulter v. Superior Court, supra,* 21 Cal.3d 144, concluded that under California common law a social host who serves alcoholic beverages to an obviously intoxicated person who the host knows intends to

15

drive a motor vehicle may be held liable for injuries to a third person caused by the intoxicated person, the Legislature enacted Civil Code section 1714, subdivision (c), which provides: "[N]o social host who furnishes alcoholic beverages to any person may be held legally accountable for damages suffered by that person, or for injury to the person or property of, or death of, any third person, resulting from the consumption of those beverages." Similarly, after this court, in *Van Horn v. Watson* (2008) 45 Cal.4th 322, interpreted an existing statutory immunity provision as extending immunity only to a person who renders emergency *medical* care and as not affecting the potential common law liability of a person who renders emergency *nonmedical* care, the Legislature amended the relevant statute to state explicitly that "No person who in good faith, and not for compensation, renders emergency medical or nonmedical care at the scene of an emergency shall be liable for any civil damages resulting from any act or omission." (Health & Saf. Code, § 1799.102, subd. (a); see, e.g., Civ. Code, § 846 ["[A landowner] owes no duty of care to keep the premises safe for entry or use by others for any recreational purpose or to give any warning of hazardous conditions, uses of, structures, or activities on such premises to persons entering for such purpose, except as provided in this section."].) Unlike the foregoing statutes, however, Health and Safety Code section 1797.196, subdivision (f), does not state categorically or explicitly, for example, that no building owner or manager (or business establishment) shall be held liable for failing to acquire or install an AED (or owes no duty to acquire an AED), but instead states only that "[n]othing in [Health and Safety Code section 1797.196] or Section 1714.21 of the Civil Code" may be construed to impose such a requirement. In our view, this language cannot properly be interpreted to preclude courts from determining, under generally applicable common law principles, whether, and if so under what circumstances, an individual's or entity's common law duty of reasonable care may include a duty to provide an AED for use in the event of a medical emergency.

16

In support of a contrary conclusion, Target relies upon two Court of Appeal decisions — *Rotolo v. San Jose Sports & Entertainment, LLC* (2007) 151 Cal.App.4th 307 (*Rotolo*) and *Breaux v. Gino's, Inc.* (1984) 153 Cal.App.3d 379 (*Breaux*). Although there is language in *Rotolo* and *Breaux* supportive of Target's position, the relevant language was not necessary for the decision in either case and, as explained, the result reached in each of those decisions more soundly rests on grounds unrelated to Health and Safety Code section 1797.196, subdivision (f).

In *Rotolo*, *supra*, 151 Cal.App.4th 307, the parents of a teenager who died as a result of sudden cardiac arrest while participating in an ice hockey game sued the owners of the ice hockey facility where their son died. The facts in *Rotolo* were particularly tragic because the ice hockey facility in question had in fact acquired an AED, which was located quite close to the spot where the teenager collapsed, but the coaches and other persons who were present during the game were unaware of the AED's location. Emergency medical personnel, who were immediately summoned, arrived at the scene too late to resuscitate the teenager. In their lawsuit, the teenager's parents maintained that the ice hockey facility's common law duty of reasonable care included an obligation to notify all users of the facility of the existence and location of any AED at the facility, and that the facility should be held liable for breach of this duty. The trial court sustained a demurrer to the parents' complaint and entered judgment for the defendant ice hockey facility, and, on appeal, the Court of Appeal affirmed.

In reaching its conclusion, the Court of Appeal in *Rotolo* pointed out that under Civil Code section 1714.21, subdivision (d), an entity that acquires an AED for emergency care is not liable for civil damages resulting from any acts *or omissions* in the use of the AED *so long as the entity has complied with the requirements set forth in Health and Safety Code section 1797.196, subdivision (b)*, and that section 1797.196, subdivision (b), in turn, requires the acquirer (in addition to other conditions) to notify *all tenants* of the building as to the existence and location of any AED (§ 1797.196,

17

subd. (b)(4)), but imposes no other notification requirements on an acquirer and, in particular, does not require the acquirer of an AED to notify *all users* of the property of the existence and location of the AED. Because the defendant in *Rotolo* had acquired an AED and had complied with all the requirements set forth in Health and Safety Code section 1797.196, subdivision (b), the Court of Appeal in *Rotolo* concluded, properly in our view, that the defendant ice hockey facility was entitled to the immunity afforded by Civil Code section 1714.21, subdivision (d); "imposition of . . . duties that are not clearly outlined in the statutes would tend to discourage, rather than to encourage, the voluntary acquisition of AED's, and would thus defeat the underlying legislative purpose of promoting the widespread use of these devices." (*Rotolo*, *supra*, 151 Cal.App.4th at p. 314.)

Although the appellate court in *Rotolo* properly ruled in the defendant's favor because the defendant in that case had acquired an AED and had complied with all the prerequisites for civil immunity that the statutes prescribed for entities who acquire an AED, at one point in the course of its opinion the Court of Appeal in *Rotolo* included the broad statement that "the Legislature has made clear that building owners and managers have no duty in the first instance to acquire and install an AED," citing Health and Safety Code section 1797.196, subdivision (f). (*Rotolo*, *supra*, 151 Cal.App.4th at p. 314.) That statement was clearly dictum inasmuch as the defendant in *Rotolo* had voluntarily acquired and installed an AED. In any event, other references in *Rotolo* to Health and Safety Code section 1797.196, subdivision (f), properly describe that provision as indicating simply that *the Legislature*, by its enactment of Civil Code section 1714.21 and Health and Safety Code section 1797.196, did not intend to impose such a duty on building owners and managers. (*Rotolo*, *supra*, at pp. 320, 324.)

Comparable language contained in the Court of Appeal decision in *Breaux*, *supra*, 153 Cal.App.3d 379, upon which Target also relies, similarly overstates the effect of the statutory language that was at issue in that case. *Breaux* was a wrongful death action,

18

brought by a husband whose wife died after choking on food while dining at a restaurant. At the time of the incident in *Breaux*, the restaurant had posted in an appropriate place state-approved instructions for the removal of food lodged in a person's throat, but no one in the restaurant attempted to remove the food from the wife's throat. Instead, a restaurant employee summoned an ambulance. The wife was alive when the ambulance arrived but died thereafter.

In *Breaux, supra*, 153 Cal.App.3d 379, the husband brought suit against the restaurant, contending that it was negligent in failing to administer appropriate first aid to his wife. The trial court granted summary judgment in favor of the defendant restaurant and, on appeal, the Court of Appeal affirmed in a brief opinion. In its opinion, the court in *Breaux* recognized that past California decisions had established "that restaurants have a legal duty to come to the assistance of their customers who become ill or need medical attention and that they are liable if they fail to act." (*Breaux, supra*, at p. 382.) The court in *Breaux* further observed, however, that "the nature and extent of their duty, i.e., what physical acts restaurants and their personnel are required to perform, has never been decided by a California court" (*ibid.*), and it went on to conclude that the Legislature had resolved the question of the nature and extent of a restaurant's duty with respect to patrons who have food lodged in their throats through one aspect of a then existing statutory provision relating to that subject.

The statute relied upon by the court in *Breaux* — Health and Safety Code former section 28689 — required the state department of health to adopt instructions for use in removing food lodged in a person's throat and to supply such instructions to the proprietor of every restaurant in the state. The statute also required the proprietor of every restaurant to post the instructions in a conspicuous place "in order that the instructions may be consulted by anyone attempting to provide relief to a victim in a choking emergency." The statute further stated: *"Nothing in this section shall impose any obligation on any person to remove, assist in removing, or attempt to remove food*

19

*which has become stuck in another person's throat.*" (Italics added.)[12]  After quoting the

emphasized language, the court in *Breaux* stated briefly and without further explanation:

"We hold that this statute establishes as a matter of law that a restaurant meets its legal

duty to a patron in distress when it summons medical assistance within a reasonable

time." (*Breaux, supra,* 153 Cal.App.3d at p. 382.)

In reaching this conclusion, the court in *Breaux, supra,* 153 Cal.App.3d 379, failed

to consider explicitly the fact that the statutory language on which it relied stated simply

that nothing "*in this section*" shall impose such an obligation (Health & Saf. Code,

former § 28689, italics added).  The court did not address whether such language

purported to preclude a court from determining whether a restaurant's *common law* duty

---

12      At the time of the *Breaux* decision, Health and Safety Code section 28689
provided in full: "The state department shall adopt and approve first aid instructions
designed and intended for use in removing food which may become stuck in a person's
throat.  Such instructions shall be limited to first aid techniques not involving the use of
any physical instrument or device inserted into the victim's mouth or throat.

"The state department shall supply to the proprietor of every restaurant in this state
such adopted and approved instructions.  The proprietor of every restaurant shall post the
instructions in a conspicuous place or places, which may include an employee notice
board, in order that the proprietor and employees may become familiar with them, and in
order that the instructions may be consulted by anyone attempting to provide relief to a
victim in a choking emergency.

"In the absence of other evidence of noncompliance with this section, the fact that
the instructions were not posted as required by this section at the time of a choking
emergency shall not in and of itself subject such proprietor or his employees or
independent contractors to liability in any civil action for damages for personal injuries or
wrongful death arising from such choking emergency.

"Nothing in this section shall impose any obligation on any person to remove,
assist in removing, or attempt to remove food which has become stuck in another
person's throat.  In any action for damages for personal injuries or wrongful death neither
the proprietor nor any person who nonnegligently under the circumstances removes,
assists in removing, or attempts to remove such food in accordance with instructions
adopted by the state department, in an emergency in a restaurant, shall be liable for any
civil damages as a result of any acts or omissions by such person in rendering such
emergency assistance." (Stats. 1975, ch. 1142, § 1, pp. 2826-2827.)

20

of reasonable care might include, either in general or in light of a special risk of choking that might be posed by particular foods or the frequency at which such choking may have occurred at the establishment, an obligation to take reasonable steps to attempt to dislodge an obstructing particle of food from a choking customer. As in *Rotolo*, the *result* reached by the court in *Breaux* — affirming summary judgment in favor of the defendant restaurant — may well have been defensible in light of other aspects of former section 28689 that could reasonably have been interpreted as intended to grant immunity from potential civil liability to any restaurant, like the defendant in *Breaux*, that properly posted the state-supplied instructions in conformance with the statutory requirements.[13] But the fact that the statutory provision at issue in *Breaux* specified simply that nothing *in the statute* imposed an obligation to remove or attempt to remove food which has become lodged in a customer's throat was not itself sufficient, in our view, to preclude a court from determining whether, under generally applicable common law principles, such a duty should properly be recognized under the common law. The court in *Breaux* failed adequately to consider the common law as an alternative source of potential tort duty or

---

[13]    As set forth in footnote 12, *ante*, the third paragraph of Health and Safety Code former section 28689 stated that "[i]n the absence of other evidence . . . the fact that the instructions were not posted as required by this section at the time of a choking emergency shall not in and of itself subject such proprietor or his employees . . . to liability in any civil action for damages . . . arising from such choking emergency." (Stats. 1975, ch. 1142, § 1, p. 2826.) By implication, this paragraph could reasonably be interpreted to extend immunity from civil liability to any proprietor who properly posted the state-supplied instructions as required by the section.

In addition, the fourth paragraph of Health and Safety Code former section 28689 stated: "In any action for damages for personal injuries or wrongful death neither the proprietor nor any person who nonnegligently under the circumstances removes, assists in removing, or attempts to remove such food in accordance with instructions adopted by the state department, in an emergency in a restaurant, shall be liable for any civil damages as a result of any acts or omissions by such person in rendering such emergency assistance." (Stats. 1975, ch. 1142, § 1, p. 2826.)

21

liability, distinct and independent of any statutorily imposed requirement. We note that the statutory provision relied upon in *Breaux*, after being renumbered on several occasions (Stats. 1984, ch. 256, § 1, pp. 790-791; Stats. 1995, ch. 415, § 6, p. 2813), was repealed in 2006. (Stats. 2006, ch. 23, § 1, p. 86.)

For the reasons discussed above, we conclude that the language of Health and Safety Code section 1797.196, subdivision (f), cannot properly be interpreted to preclude a court from determining whether a business's common law duty to exercise reasonable care with regard to the health and safety of its customers includes, either in general or in particular circumstances, an obligation to acquire and make available an AED for use in a medical emergency.

### B. Do the current California AED statutes reflect a legislative intent to "occupy the field" with regard to AEDs and thus implicitly preclude recognition of a common law duty to acquire and make available an AED?

As already noted, in addition to relying upon Health and Safety Code section 1797.196, subdivision (f), Target alternatively contends that current California AED statutes, viewed as a whole, "occupy the field" with regard to the regulation of AEDs, and thus implicitly preclude courts from determining whether California common law imposes on a business establishment a duty to acquire or make available an AED for the use of its customers in a medical emergency, either generally or in particular circumstances. As explained, we conclude that current California AED statutes do not support this claim.

As this court observed in *I.E. Associates v. Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 285: "The general rule is that statutes do not supplant the common law unless it appears that the Legislature intended to cover the entire subject or, in other words, to 'occupy the field.' [Citations.] '[G]eneral and comprehensive legislation, where course of conduct, parties, things affected, limitations and exceptions are minutely described,

22

indicates a legislative intent that the statute should totally supersede and replace the common law dealing with the subject matter.' "

We conclude that the current California AED statutes do not evince any such legislative intent. The principal general AED statutes — Civil Code section 1714.21 and Health and Safety Code section 1797.196 — set forth the circumstances in which an individual or entity who acquires or uses an AED will be immune from civil liability for damages relating to the use or nonuse of the AED. Those statutes are not incompatible with a common law rule that requires either a particular type of business establishment, or business establishments in general, to acquire an AED for the use of its customers in a medical emergency, because those immunity statutes would fully apply and would afford statutory immunity from civil liability to such a business so long as it complied with the requirements set forth in the statutory provisions. Although the AED immunity statutes were unquestionably enacted to provide an incentive to individuals and entities to *voluntarily* acquire and make available AEDs for use in an emergency (see Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2041 (2001-2002 Reg. Sess.) as amended Apr. 16, 2002), by their terms the statutes apply fully to individuals or entities who acquire and make available AEDs and comply with all of the prerequisites to immunity set forth in the statutes even if such individuals or entities acquire an AED under compulsion of, or in compliance with, a common law duty. The applicability of the immunity statutes to entities who are under a common law duty to acquire and provide an AED would not in any way reduce or undermine the incentive that the immunity statutes provide to persons or entities that voluntarily obtain and make available AEDs.

In addition to the statutory provisions affording civil immunity to those who acquire AEDs under specified circumstances, the Legislature has enacted one statutory provision — Health and Safety Code section 104113 — that requires one category of business establishments — health studios — to acquire and maintain AEDs for the use of their customers in a medical emergency. Although to date the Legislature has chosen to

23

mandate that AEDs be provided only in health studios, there is nothing in section 104113 that would be incompatible with a court's determination that, under generally applicable common law principles, the common law duty of care of another category or categories of business establishments (or of business establishments generally) also includes an obligation to acquire an AED for the benefit of the business's customers. Such a determination regarding the scope of a business's common law duty would not interfere with or undermine the operation of section 104113, or constitute impermissible judicial second-guessing of the Legislature's action. As this court explained in *City of Moorpark v. Superior Court, supra,* 18 Cal.4th at page 1156: "When courts enforce a common law remedy despite the existence of a [different] statutory remedy, they are not 'say[ing] that a different rule for the particular facts should have been written by the Legislature.' [Citation.] They are simply saying that the common law 'rule' coexists with the statutory 'rule.' "

Finally, the Legislature's enactment of Government Code section 8455, to encourage and facilitate the placement of AEDs in state-owned and state-leased buildings, is not inconsistent with, and does not even implicate, the question of the scope of a private business's common law duty of care to its customers, and certainly does not evince a legislative intent to preclude California courts from determining the scope of such duty as it relates to the acquisition and provision of AEDs on business premises.

In addition to relying upon the Legislature's enactment of Civil Code section 1714.21, Health and Safety Code sections 1797.196 and 104113, and Government Code section 8455 to support its claim that the current California AED statutes should be viewed as fully "occupying the field" of AED requirements, Target also points to the fact that in 2009 the Legislature passed a bill that would have additionally required golf courses and amusement parks to acquire and install AEDs, but that the Governor vetoed the bill. (Assem. Bill No. 1312 (2009-2010 Reg. Sess.), § 1, passed Sept. 9, 2009, vetoed Oct. 12, 2009.) This legislative action (or inaction), however, no more than the

24

Legislature's enactment of Health and Safety Code section 104113 relating to health studios, does not indicate a legislative intent to preclude California courts from determining, under generally applicable common law principles, whether a common law duty to acquire an AED should properly be recognized for a particular category of business or more generally.[14]

In sum, we conclude that the current California AED statutes do not constitute the type of " '[g]eneral and *comprehensive* legislation, where course of conduct, parties, things affected, limitations and exceptions are minutely described' " (*I.E. Associates v. Safeco Title Ins. Co.*, *supra*, 39 Cal.3d at p. 285, italics added) so as to indicate that the Legislature intended the statutes to totally supersede and preclude any operation of general common law tort principles with regard to the acquisition and provision of AEDs. Accordingly, we conclude that the California AED statutes, when viewed as a whole, do not fully "occupy the field" and thereby implicitly preclude California courts from determining whether, under California common law, Target's common law duty of

---

[14] Target contends that the gubernatorial veto of Assembly Bill No. 1312 (2009-2010 Reg. Sess.) has particular significance because the veto came after the California Health and Human Services Agency had advised the Governor that the bill "would increase costs . . . with no clear evidence that the availability of these devices would save lives." (Cal. Health & Human Services Agency, Enrolled Bill Rep. on Assem. Bill No. 1312 (2009-2010 Reg. Sess.) Sept. 29, 2009, p. 8.) The bill in question, however, proposed, in addition to adding AED requirements for golf courses and amusement parks, to extend to 2014 the existing 2012 sunset date applicable to the AED requirement for health studios, and in vetoing the bill the Governor did not cite the California Health and Human Services Agency's comments, but instead stated that "[t]here is no compelling need to extend the 2012 sunset date at this time, especially when a reasonable exemption for a particular type of business model was sought and rejected. I am not willing to extend this law to additional businesses until this problem is addressed." (Governor's veto message concerning Assem. Bill No. 1312 (Oct. 12, 2009) __ Assem. J. (2009-2010 Reg. Sess.) p. 3513 <http://www.leginfo.ca.gov/pub/09-10/bill/asm/ab_1301-1350/ab_1312/vt/20091012.html> [as of OPN FILE DATE].)

25

reasonable care to its patrons includes an obligation to acquire and make available an
AED for use in a medical emergency.[15]

Although, for the reasons discussed above, we conclude that the current California
statutes do not preclude courts from determining whether a common law duty to acquire
and make available an AED (either in general or in particular circumstances) should be
recognized, it should be emphasized that this does not mean that in considering whether
such a common law duty should be recognized, courts should not take into account the
existing California AED statutes insofar as such statutes bear on the relevant policy
considerations that affect that determination. As explained hereafter, in considering
whether Target's common law duty of care to its patrons includes a duty to acquire and

---

[15]    For the reasons discussed in the text, we disapprove dicta in *Rotolo v. San Jose
Sports & Entertainment, LLC, supra,* 151 Cal.App.4th at page 314, stating broadly that
"the Legislature has occupied the field by enacting a number of detailed and
comprehensive statutes governing the acquisition and use of AED's," and citing Civil
Code section 1714.21, Health and Safety Code section 1797.196, and Government Code
section 8455. As explained earlier (*ante,* pp. 17-18), the *Rotolo* court correctly concluded
that an entity that acquires an AED and that fully complies with the requirements set
forth in Health and Safety Code section 1797.196 is immune from civil liability under
Civil Code section 1714.21, and that, in light of such statutes, the common law cannot
properly be viewed as imposing liability upon an acquirer of an AED on the basis of
additional requirements or duties not set forth in Health and Safety Code section
1797.196. In this limited sense, it can be said that the provisions of Civil Code section
1714.21 and Health and Safety Code section 1797.196 "occupy the field" *regarding the
duty or requirements that may be placed upon an acquirer of an AED in order to obtain
immunity from civil liability.* (Accord, *I.E. Associates v. Safeco Title Ins. Co., supra,* 39
Cal.3d at p. 285 & fn. 3 [holding that the statutory provisions regulating the nonjudicial
foreclosure of deeds of trust were intended to "occupy the field" with regard to "the
question of notice that must be given before a foreclosure sale" but cautioning that
nothing in the opinion "is designed to affect the duties imposed on the trustee concerning
the conduct of the sale"].) As explained in the text, however, the statutes in question
cannot properly be viewed as intended to preclude courts from determining whether, and
if so under what circumstances, California common law imposes a duty upon a business
to acquire an AED for the use of its customers in a medical emergency.

26

make available in its stores an AED, the current California AED statutes are relevant and instructive in a number of respects. (See *post*, pp. 34-38.)

### V. Under California Law, Does Target Have a Common Law Duty to Acquire and Make Available One or More AEDs to Aid a Patron in a Medical Emergency?

In analyzing the scope of the common law duty of reasonable care that a business entity owes to its patrons or customers to determine whether that duty includes an obligation to acquire and make available an AED, we begin with the well-established principle, set forth in the governing California cases, that whereas, as a general rule, an individual or entity does not have a duty under the common law to come to the aid of another person whom the individual or entity has not injured (the general no-duty-to-rescue rule; see Rest.2d Torts, § 314, p. 116),[16] a different rule is applicable with regard to the common law duty that a business entity owes to its patrons on its business premises. Because of the so-called "special relationship" between a business entity and its patrons, past California cases have recognized that a business may have a duty, under the common law, to take reasonable action to protect or aid patrons who sustain an injury

---

[16]      Section 314 of the Restatement Second of Torts states: "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."

Comment c to section 314 explains: "The origin of the rule lay in the early common law distinction between action and inaction, or 'misfeasance' and 'non-feasance.' In the early law one who injured another by a positive affirmative act was held liable without any great regard even for his fault. But the courts were far too much occupied with the more flagrant forms of misbehavior to be greatly concerned with one who merely did nothing, even though another might suffer serious harm because of his omission to act. Hence liability for non-feasance was slow to receive any recognition in the law. It appeared first in, and is still largely confined to, situations in which there was some special relation between the parties, on the basis of which the defendant was found to have a duty to take action for the aid or protection of the plaintiff." (Rest.2d Torts, § 314, com. c, pp. 116-117.)

27

or suffer an illness while on the business's premises, including "undertak[ing] relatively simple measures such as providing 'assistance [to] their customers who become ill or need medical attention . . . .' " (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 241 (*Delgado*); see *Breaux, supra*, 153 Cal.App.3d at p. 382; *De Vera v. Long Beach Pub. Transportation Co.* (1986) 180 Cal.App.3d 782, 793-794; see generally Rest.2d Torts, § 314A, p. 118.)[17]

All the parties in this case agree that, under California law, Target has a common law duty to provide at least some assistance to a patron who suffers a sudden cardiac arrest while shopping at a Target store. The parties sharply disagree, however, as to the scope of that duty. Target maintains that its employees fully satisfied its common law duty of reasonable care by immediately summoning emergency medical personnel upon learning of the patron's collapse, and that at most it might be required to provide simple first aid measures but that it had no duty to acquire an AED in advance of the incident for

[17]    Section 314A of the Restatement Second of Torts, entitled "Special Relations Giving Rise to Duty to Aid or Protect," states:

"(1) A common carrier is under a duty to its passengers to take reasonable action
        "(a) to protect them against unreasonable risk of physical harm, and
        "(b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
"(2) An innkeeper is under a similar duty to his guests.
"(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.
"(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other." (Rest.2d Torts, § 314A, p. 118.)

A caveat to section 314A states: "The Institute expresses no opinion as to whether there may not be other relations which impose a similar duty." (Rest.2d Torts, *supra*, at p. 119.)

Past cases have consistently interpreted subdivision (3) of section 314A (Rest.2d Torts) to encompass a business entity, like Target, whose business premises are open to the public, and more broadly to reflect the duty owed by business entities to patrons who are injured or fall ill while on the business's premises. Target does not argue otherwise.

28

potential use in the event of such a medical emergency. By contrast, plaintiffs assert that because of the important potentially life-saving role that an AED may play in the event of sudden cardiac arrest, the size of the Target store in question, the number of customers who patronize the store, and the relatively low cost of an AED device, Target's common law duty of reasonable care to its patrons included an obligation to obtain an AED, and that a jury could properly find that Target acted unreasonably and negligently in failing to do so and that such negligence was a substantial cause of the sudden-cardiac-arrest victim's death.

We have no occasion in this case to determine whether a business entity's common law duty to provide assistance to an injured or ill patron never requires a business to do anything more than to promptly summon emergency medical assistance, as Target suggests, or whether a business's common law duty of reasonable care, in some circumstances, may require it to take some additional measures beyond summoning emergency medical assistance. Plaintiffs' claim in this case rests solely on Target's failure to acquire and make available in its department store an AED for use in a medical emergency.[18] Accordingly, we limit our consideration to this issue only. (*Castenada v. Olsher* (2007) 41 Cal.4th 1205, 1214 ["The duty analysis . . . requires the court . . . to identify the specific action or actions the plaintiff claims the defendant had a duty to undertake"].) For the reasons set forth below, we conclude that the common law duty of reasonable care that Target owes to its business patrons does not include such an obligation.

---

[18]    As we explain hereafter, a duty "to acquire and make available" an AED must reasonably be understood to entail a variety of related obligations, including proper maintenance of the AED, AED and CPR training and practice, and staffing of trained personnel. (See *post*, p. 34.)

There have been a few California Court of Appeal cases that directly involved the question of a business's common law duty to provide first aid or medical assistance to a patron who is injured or becomes ill on the business's premises. (See, e.g., *Rotolo, supra*, 151 Cal.App.4th 307; *Breaux, supra*, 153 Cal.App.3d 379.) However, all of the most analogous California common law cases that have reached this court have involved the distinct but related question whether a business has a common law duty to take steps to protect its patrons from criminal activity of third persons that endangers such patrons on its premises. (See, e.g., *Taylor v. Centennial Bowl, Inc.* (1966) 65 Cal.2d 114; *Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112; *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 (*Ann M.*); *Kentucky Fried Chicken of Cal., Inc. v. Superior Court, supra,* 14 Cal.4th 814; *Delgado, supra*, 36 Cal.4th 224; *Castaneda v. Olsher, supra*, 41 Cal.4th 1205.) As noted above (*ante,* at p. 28, fn. 17), section 314A of the Restatement Second of Torts groups together both the duty to provide aid to an ill or injured patron and the duty to protect a patron against an unreasonable risk of physical harm, reflecting the fact that in both settings the legal duty to the patron arises from the relationship between the parties and exists even though a business has not itself caused the injury or illness in question. This court's decision in *Delgado, supra,* 36 Cal.4th 224, which involved the scope of a business's common law duty to protect a patron against a third-party criminal assault, recognized the similarity between the two settings, citing and relying upon one of the California Court of Appeal decisions that set forth a business's common law duty to "undertake relatively simple measures" to aid patrons who become ill or need medical attention while on the business's premises. (*Id.* at p. 241 [citing *Breaux, supra,* 153 Cal.App.3d 379, 382].)

With respect to third-party criminal conduct, our past decisions have noted a distinction between (1) a business's duty to take precautionary steps, in advance of any specific criminal activity, to provide protections to its patrons against criminal conduct that may occur in the future, and (2) a business's duty to take immediate action in

30

response to ongoing criminal activity that threatens the safety of its patrons. (See, e.g., *Delgado*, *supra*, 36 Cal.4th at pp. 240-242; *Morris v. De La Torre* (2005) 36 Cal.4th 260, 271.)

In considering the scope of a business's common law duty to take reasonable steps to protect the health of its patrons while the patrons are on the business's premises, we draw a comparable distinction between (1) a business's common law duty *to take precautionary steps prior to the time such an injury or illness has occurred* in light of the foreseeability that such an injury or illness may occur, and (2) a business's common law duty to act to assist a patron from an ongoing threat to the patron's health and safety *after the patron has experienced an injury or illness on the business's premises*.

In the present case, plaintiffs do not claim that Target failed to take adequate steps to protect its patron after she suffered sudden cardiac arrest. Thus, this second aspect of a business's common law duty is not implicated in this case.

Instead, we consider whether Target had a common law duty to take the precautionary step of acquiring and making available an AED in advance of a medical emergency in light of the possibility that such a medical emergency might occur on the business premises sometime in the future.

In evaluating whether a business is under a duty to provide precautionary measures to protect patrons against potential third-party criminal conduct, past California cases generally have looked primarily to a number of factors, including (1) the degree of foreseeability that the danger will arise on the business's premises and (2) the relative burden that providing a particular precautionary measure will place upon the business. (See, e.g., *Ann M.*, *supra*, 6 Cal.4th at pp. 678-679; *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1189-1199; *Delgado*, *supra*, 36 Cal.4th at pp. 236-240; *Castenada v.*

31

*Olsher, supra*, 41 Cal.4th at pp. 1213-1214.)[19]  If the relative burden of providing a particular precautionary safety or security measure is onerous rather than minimal, the governing cases have held that absent a showing of a "heightened" or "high degree" of foreseeability of the danger in question, it is not appropriate for courts to recognize or impose a common law duty to provide the measure.  (See, e.g., *Ann M.*, *supra*, at p. 679; *Delgado*, *supra*, at pp. 243-244, fn. 24; *Castaneda v. Olsher*, *supra*, at p. 1213.)  These decisions implicitly recognize that, in the absence of such heightened foreseeability, the determination whether a business (or businesses in general) should be required to provide a costly or burdensome precautionary safety measure to protect against potential future third-party criminal conduct should more appropriately be made by the Legislature rather than by a jury applying a general reasonableness standard in a particular case.

There are, of course, differences between the risk to a business patron posed by potential third-party criminal conduct on the business's premises and the risk that a patron may suffer a medical emergency on a business's premises because of the patron's own medical condition, and those differences, in many circumstances, may reasonably affect the nature and scope of the duty that a business owes to protect a patron from such risk of harm.[20]  For purposes of resolving the issue before us in this case, however, we

---

[19]     These factors are among those set forth in *Rowland v. Christian, supra,* 69 Cal.2d 108, 113, as considerations that California courts generally look to in determining the existence and scope of a common law duty.  As listed in *Rowland*, the considerations include "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved."  (69 Cal.2d at p. 113.)

[20]     For example, a business owner may ordinarily be in a better position than a patron to evaluate the risk that a third-party criminal assault will occur on its premises, but such

*(footnote continued on next page)*

32

need go no further than to conclude that, as in the criminal assault cases, when the precautionary medical safety measures that a plaintiff contends a business should have provided are costly or burdensome rather than minimal, the common law does not impose a duty on a business to provide such safety measures in the absence of a showing of a heightened or high degree of foreseeability of the medical risk in question. In the absence of at least a showing of heightened foreseeability of the particular medical risk at issue, the policy decision whether a particular type of business (or businesses in general) should be required to provide a costly or burdensome precautionary safety measure for use in the event of a possible medical emergency resulting from a patron's medical condition is appropriately made by the Legislature, rather than by a jury on a case-by-case basis guided only by a general, unfocused "reasonable care" standard after a medical emergency has already occurred.

In their briefing at earlier stages of this litigation, plaintiffs maintained that requiring a business to acquire and make available an AED would impose only a relatively minor burden on a business establishment, relying primarily upon the fact that Target itself sold AEDs on its Web site for approximately $1,200. In the briefs filed in this court, however, plaintiffs appear to acknowledge that a requirement that a business acquire and make available an AED for use in a medical emergency cannot accurately be described as imposing only a minor burden on a business establishment. In their current briefs, plaintiffs explicitly disclaim any intent to seek a ruling that would recognize a general common law duty to provide an AED that would be applicable to all retail establishments including, for example, "a modest neighborhood dry cleaners or gas

---

*(footnote continued from previous page)*

a business owner may not be better able than a patron to evaluate the risk that a patron will suffer a medical emergency on its premises as the result of the patron's personal medical condition.

33

station." Instead, plaintiffs ask this court to recognize a common law duty to provide an AED only "for proprietors who have the manpower and the resources to fulfill the requirements of the AED immunity statutes without undue burden."

We agree with plaintiffs' apparent current concession that a general common law duty to acquire and make available an AED for the use of its patrons would impose considerably more than a minor or minimal burden on a business establishment. The statutory provisions and related regulations establishing the prerequisites to civil immunity for those entities acquiring an AED reflect the numerous related requirements that a jury is likely to view as reasonably necessary to comply with such a duty. Apart from the initial cost of the AEDs themselves, significant obligations with regard to the number, the placement, and the ongoing maintenance of such devices, combined with the need to regularly train personnel to properly utilize and service the AEDs and to administer CPR, as well as to have trained personnel reasonably available on the business premises, illustrate the magnitude of the burden. (See Health & Saf. Code, § 1797.196, subd. (b); Cal. Code Regs., tit. 22, §§ 100031-100056.2.) Compliance with these numerous obligations clearly implicates more than a minor or minimal burden.[21]

With respect to the question of foreseeability, plaintiffs' complaint does not point to any aspect of Target's operations or the activities that Target's patrons engage in on its premises to indicate a high degree or heightened foreseeability that its patrons will suffer

[21]    One secondary source notes an additional burden that is ordinarily entailed when an AED is installed in an area open and accessible to the public. The article explains: "Any equipment is useless unless it is readily accessible in an emergency . . . . [¶] . . . Unfortunately, accessibility will provide opportunities for theft or vandalism of equipment. This problem has been solved in many schools and public places such as airports by the use of mounted cabinets with audible alarms that sound when the cabinet door is opened. These cabinets cost [approximately] $250 to $500." (Hazinski, *Response to Cardiac Arrest and Selected Life-Threatening Medical Emergencies* (2004) 109 Circulation 278, 285.)

34

sudden cardiac arrest on its premises. Instead, it appears that the risk of such an occurrence is no greater at Target than at any other location open to the public.[22] Furthermore, plaintiff argues in its brief that death is especially likely to result from sudden cardiac arrest that occurs in a big-box store "because it is impossible for emergency crews to reach a stricken invitee in time" in a large, heavily trafficked building. There is nothing, however, to suggest that the risk of death from sudden cardiac arrest in a big-box store is any greater than the risk of death from sudden cardiac arrest that occurs at any other location that is equally or more distant from existing emergency medical services.

In light of the extent of the burden that would be imposed by a requirement to acquire and make available an AED and in the absence of any showing of heightened foreseeability of sudden cardiac arrest or of an increased risk of death, we conclude that under California law, Target owes no common law duty to its customers to acquire and make available an AED. Under these circumstances, it is appropriate to leave to the Legislature the policy decision whether a business entity should be required to acquire and make available an AED for the protection of its patrons. (Cf., e.g., *Philadelphia Indemnity Ins. Co. v. Montes-Harris* (2006) 40 Cal.4th 151, 163 ["the Legislature stands in the best position to identify and weigh the competing consumer, business, and public safety considerations"]; accord, *California Grocers Assn. v. City of Los Angeles* (2011) 52 Cal.4th 177, 210.)

Furthermore, numerous factors that logically bear on the question whether, as a matter of public policy, an obligation to acquire and make available an AED should be

---

[22]    We note in this regard that the fact that occasional incidents of sudden cardiac arrest may have occurred in the past in Target stores nationwide, or even in the particular Target store in question, would not demonstrate a "heightened foreseeability" of such incidents in Target stores over other venues, inasmuch as such occasional incidents of sudden cardiac arrest could occur in any venue.

35

imposed upon a particular type of business provide further support for the conclusion that that determination should be made by the Legislature rather than by a jury on a case-by-case basis. For example, the nature of a business's activities, the relationship of those activities to the risk that a patron may suffer sudden cardiac arrest, the proximity of the business to other emergency medical services, and other potentially relevant factors are considerations that appear especially appropriate for legislative inquiry and determination. (See, e.g., Md. Inst. for Emergency Medical Services Systems, Rep. to the Maryland General Assembly Regarding the Placement of Automated External Defibrillators (Dec. 2007) <http://www.miemss.org/home/Policy/LegislativeReports/tabid/134/Default.aspx> [as of OPN FILE DATE]; Nichol et al., *Cost Effectiveness of Defibrillation by Target Responders in Public Settings* (2003) 108 Circulation 697 <http://circ.ahajournals.org/content/108/6/697.full> [as of OPN FILE DATE]; Cram et al., *Cost-effectiveness of Automated External Defibrillator Deployment in Selected Public Locations* (2003) 18 J. Gen. Internal Med. 745.). Similarly, the relative size of a retail business's premises, the number of patrons the business serves, or the amount of its owner's resources — factors which plaintiffs urge this court to rely on in this case to limit the reach of a decision in their favor — do not lend themselves to the formulation of a workable common law rule that would provide adequate guidance to businesses. Instead these factors are considerations that are much more suitable to legislative evaluation and line-drawing. Leaving such factors to be evaluated by a jury under a reasonableness standard on a case-by-case basis after a fatal heart attack has occurred on the business's premises, as plaintiffs urge, would as a realistic matter effectively require most if not all businesses to take all of the precautionary steps necessary to qualify for civil immunity under the applicable Good Samaritan statutes.

As we have seen, the California Legislature is well aware of the magnitude and severity of the health risks posed by sudden cardiac arrest and has taken a variety of steps

36

to address this serious problem.  To encourage the voluntary acquisition of AEDs, the Legislature has afforded immunity from potential civil liability, under specified circumstances, for all businesses that acquire AEDs and make them available to their patrons.  (Civ. Code, § 1714.21, Health & Saf. Code, § 1797.196.)  In addition, the Legislature has encouraged and facilitated the provision of AEDs in many state-owned and state-leased buildings.  (Gov. Code, § 8455.)  Finally, the Legislature has required all health studios in California to make an AED available on their premises.  (Health & Saf. Code, § 104113.)  To date, the Legislature has not imposed such a requirement on other types of business establishments.  For the reasons discussed above, we believe that in this context the Legislature is generally in the best position to examine, evaluate and resolve the public policy considerations relevant to the duty question.

We observe that in the AED realm, other state legislatures have generally taken steps similar to those of the California Legislature.  Most states in the country have, by legislative action, adopted some form of immunity from civil liability for nonmedical entities that acquire and make available AEDs for use in a medical emergency.  (See Nat. Conf. of State Legislatures, State Laws on Cardiac Arrest and Defibrillators, *supra*, <http://www.ncsl.org/issues-research/health/laws-on-cardiac-arrest-and-defibrillators-aeds.aspx> [as of OPN FILE DATE].)  Moreover, many other states have also, by statute, identified health or fitness studios as places where AEDs are required to be provided,[23]

---

[23]     The following additional states currently require fitness studios to provide an AED: Arkansas (Ark. Code Ann. § 20-13-1306(b)(1)), Illinois (210 Ill. Comp. Stat. 74/15), Indiana (Ind. Code § 24-4-15-5), Louisiana (La. Rev. Stat. Ann. § 40:1236.13(D)), Massachusetts (Mass. Gen. Laws ch. 93, § 78A), Michigan (Mich. Comp. Laws § 333.26312), New Jersey (N.J. Stat. Ann. § 2A:62A-31), New York (N.Y. Gen. Bus. Law § 627-a), Oregon (Or. Rev. Stat. § 431.680), Pennsylvania (73 Pa. Cons. Stat. § 2174), and Rhode Island (R.I. Gen. Laws § 5-50-12).

and some jurisdictions have designated other locations — for example, schools,[24] public recreational facilities,[25] and government buildings[26] — as places where AEDs must be made available. We are aware of only one state that by statute has singled out large retail department stores, such as the Target store at issue here, as a location where an AED is required to be provided.[27]

---

[24]    The following states require at least some schools to have an AED on school premises: Alabama (Ala. Code § 16-1-45), Arkansas (Ark. Code Ann. § 6-10-122), Connecticut (Conn. Gen. Stat. §§ 10-212d, 10a-55l), Georgia (Ga. Code Ann. § 20-2-775), Maryland (Md. Code Ann., Educ. § 7-425), Nevada (Nev. Rev. Stat. Ann. § 450B.600, subd. (1)(a)), New Jersey (N.J. Stat. Ann. § 18A:40-41a), New York (N.Y. Educ. Law § 917), North Dakota (N.D. Cent. Code § 15.1-07-31), Oklahoma (Okla. Stat. tit. 70, § 1210.200), Oregon (Or. Rev. Stat. §§ 339.345, 431.690, subd. (3)), South Carolina (S.C. Code Ann. § 59-17-155), Texas (Tex. Educ. Code Ann. § 38.017), Washington (Wash. Rev. Code § 28A.300.471).

[25]    The following states require an AED in some public recreation facilities: Connecticut (Conn. Gen. Stat. § 19a-197c [golf courses], Maryland (Md. Local Gov't Code Ann. § 1-1310) [swimming pools], Nevada (Nev. Rev. Stat. Ann. § 450B.600, subd. (1)(d) [sporting arenas or events centers], and New York (N.Y. Pub. Health Law § 225, subds. 5-b [places of public assembly], 5-c [beaches or swimming facilities]).

[26]    The following states require an AED in some government buildings: Arizona (Ariz. Rev. Stat. Ann. § 34-401), Florida (Fla. Stat. § 768.1326), Nevada (Nev. Rev. Stat. Ann. § 450B.600, subds. (e), (f)), and Rhode Island (R.I. Gen. Laws § 23-6.2-2).

[27]    The one state is Oregon, which has enacted a statute that requires the owner of a "place of public assembly" to have at least one AED on its premises, and that defines "place of public assembly" for purposes of the statute to mean "a single building that has 50,000 square feet or more of indoor floor space . . . where . . . [t]he public congregates for purposes of deliberation, shopping, entertainment, amusement, or awaiting transportation . . . ." (Or. Rev. Stat. § 431.690.) Plaintiffs' complaint does not indicate the square footage of the Target store at issue in this case, but Target's Web site indicates that, as of January 2009, its general merchandise stores averaged 126,000 square feet. (Target, Fast Facts (Jan. 13, 2009) <http://pressroom.target.com/news/fastfacts> [as of OPN FILE DATE].)

38

Furthermore and most significantly, to date *every* state appellate court that has confronted the legal question that is before us in this case — namely, whether a business's *common law* duty to assist patrons who become ill on the business's premises includes a duty to acquire and make available an AED — has concluded that the business's common law duty does *not* impose such an obligation.  (See, e.g., *L.A. Fitness Int'l, LLC v. Mayer* (Fla.Dist.Ct.App. 2008) 980 So.2d 550, 561-562; *Boller v. Robert W. Woodruff Arts Center, Inc.* (Ga.Ct.App. 2011) 716 S.E.2d 713; *Salte v. YMCA of Metropolitan Chicago Foundation* (Ill.App.Ct. 2004) 814 N.E.2d 610, 615; *Rutnik v. Colonie Ctr. Court Club, Inc.* (N.Y.App.Div. 1998) 672 N.Y.S.2d 451, 453.)  The uniformity of these sister-state appellate decisions lends support to our conclusion regarding the scope of Target's common law duty under California law.[28]

---

[28]    In its opinion certifying the state law question to this court, the Ninth Circuit cited three out-of-state trial court decisions that permitted a common law cause of action based on a failure to provide an AED to go to trial.  (*Verdugo v. Target Corp.*, *supra*, 704 F.3d 1044, 1050 [citing *Aquila v. Ultimate Fitness* (2011, No. CV0850171595) 2011 Conn. Super. LEXIS 1474; *Ksypka v. Malden YMCA* (2007, No. 03-4726) 2007 Mass. Super. LEXIS 43; *Fowler v. Bally Total Fitness Corp.* (Ill.Cir.Ct. Cook Cty., 2006, No. 07 L 12258)].)  The defendants in all three cases were fitness studios, and the trial court opinion in each case, in denying the defendant's motion to dismiss or for summary judgment, relied upon the heightened foreseeability of sudden cardiac arrest in the fitness studio setting.  (*Aquila*, *supra*, 2011 Conn. Super. LEXIS 1474, p. *10; *Ksypka*, *supra*, 2007 Mass. Super. LEXIS 43, pp. *1-*2; *Fowler*, *supra*, pp. 9-10.)

39

## VI. Conclusion

Accordingly, in response to the Ninth Circuit's request, we conclude that, under California law, Target's common law duty of reasonable care to its patrons does not include an obligation to acquire and make available an AED for the use of its patrons in a medical emergency.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

BAXTER, J.
CHIN, J.
CORRIGAN, J.
LIU, J.
NICHOLSON, J.*

---

\* Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

40

C O P Y

VERDUGO v. TARGET CORP.

*S207313*

## CONCURRING OPINION BY WERDEGAR, J.

I agree with the majority's conclusion that "under California law, Target's common law duty of reasonable care to its patrons does not include an obligation to acquire and make available an AED [automated external defibrillator] for the use of its patrons in a medical emergency." (Maj. opn., *ante*, at p. 40.) Unlike the majority, however, I reach that conclusion without analogizing this case to those involving protection from third-party criminal activity. (*Id.*, at pp. 30-33.) Nor do I embrace the majority's broad rule, drawn from that analogy, that property owners need not adopt any nonminimal precautionary medical safety measure "in the absence of a showing of a heightened or high degree of foreseeability of the medical risk in question." (*Id.*, at p. 33.) I would instead directly evaluate the specific obligation proposed here, that of installing and maintaining an AED in a large retail business, under the duty factors we outlined in *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 (*Rowland*), and would hold only that the duty of reasonable care does not extend to that particular obligation.

As the majority explains (maj. opn., *ante*, at pp. 27-28), because of the special relationship between a business and its patrons, a business's common law duty of due care includes the obligation to take reasonable measures to help patrons who suffer an injury or the effects of illness while on the premises. Courts may recognize exceptions to the duty of reasonable care where clearly supported by public policy (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771

1

(*Cabral*); *Rowland, supra*, 69 Cal.2d at p. 112) and we have identified several factors that, taken together, may justify such a departure from the general duty rule: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland*, at p. 113; see, e.g., *Cabral*, at pp. 774-784 [rejecting claimed exception to duty of care for stopping alongside a freeway]; *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472-478 [recognizing exception to duty of care for normal operation of garbage truck near bridle path]; *Rowland*, at pp. 117-119 [rejecting categorical exception to duty of care for licensees and trespassers on real property].)

That some of the millions of Californians who visit large retail stores each year will suffer cardiac arrests while shopping is, of course, foreseeable, though as the majority observes (maj. opn., *ante*, at pp. 34-35), the probability appears to be no greater in a store than in any place open to the public. Nor does it appear that cardiac arrest in a large retail store is particularly likely to lead to death. Plaintiffs assert the size and configuration of such a store makes timely provision of emergency medical services impossible, but they fail to demonstrate the truth of that proposition, nor is it one we can take notice of or assume. Moreover, while the death of a cardiac arrest victim like plaintiffs' decedent leaves no doubt as to fact of injury, the connection between that injury and defendant's choice not to install and maintain an AED is uncertain. The parties provide different estimates as to how often presence of an AED saves a cardiac arrest victim, defendant asserting around 20 to 30 percent of the time, and plaintiffs around 50 to 70

2

percent, but that an AED does not provide sure and certain protection from death is in any event clear.

Turning to *Rowland*'s public policy factors, I note that no moral blame can be attached to the omission at issue here. "The overall policy of preventing future harm is ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible." (*Cabral, supra,* 51 Cal.4th at p. 781.) Here, however, there is a substantial question whether recognizing a common law duty of care would best serve that preventive goal in an area already significantly regulated by statute. The Legislature's approach of encouraging *voluntary* installation of AEDs by providing qualified immunity for ordinary negligence to those acquiring them for emergency use (Civ. Code, § 1714.21, subd. (d)), while seeking to fund their installation in state buildings (Gov. Code, § 8455), and *requiring* installation of AEDs only in fitness facilities (Health & Saf. Code, § 104113, subd. (a)), may well provide an equivalent level of prevention without the uncertain burdens of a broad tort duty. As the majority observes, those burdens are likely to be more than minimal and, because the limiting factors proposed by plaintiffs are not readily amenable to judicial definition, they are also likely, in practice, to be widely spread. (Maj. opn., *ante,* at pp. 34-36.) The final *Rowland* factor, the availability and cost of insurance for the risk, might appear to favor recognition of a duty, but the serious, sometimes fatal consequences of cardiac arrest and the difficulty of effectively limiting a common law duty to prepare for it create the possibility that insurance costs would be relatively high for smaller businesses.

Balancing these foreseeability and policy factors together, I join the majority's conclusion that the decision whether and how to expand the legal obligation to install and maintain AEDs is best left to the Legislature. (Maj. opn., pp. 36-37.) As stated earlier, however, I do not join the majority in all of its reasoning.

3

The majority's comparison to prevention of criminal acts by third parties is not compelling and, in my view, is somewhat troubling. The negligence claims made in these two factual contexts both rest on omissions — failure to take preventive anticrime measures and failure to prepare for cardiac arrests by installing an AED — rather than on any affirmative action by the property owner, but they seem otherwise to have little in common. In the criminal assault cases the defendant is asked to take measures to control the intentional criminal acts of others, a type of duty that has been regarded as particularly problematic. (See *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 676 [resting analysis on premise that "a duty to take affirmative action to control the wrongful acts of a third party will be imposed only where such conduct can be reasonably anticipated."].) Imposing liability on a business for the consequences of a third person's intentional assault involves a morally questionable shifting of responsibility that is simply not implicated by the claim a business should have installed an AED on its premises.

As the majority observes (maj. opn., *ante*, at p. 30), both prevention of criminal assaults and aid in a medical emergency come within the general category of a duty to aid or protect discussed in section 314A of the Restatement Second of Torts. But that is only to say both types of negligence claims rest on the defendant's *nonfeasance* in the face of a special relationship. By assuming merely from their proximity in the Restatement that the nonminimal burden/heightened foreseeability rule we have developed for prevention of criminal acts also applies to preparation for medical emergencies, the majority may leave the unfortunate impression that the rule for prevention of assaults applies to *all* claims of negligent omission to act within a special relationship. Such a broad conclusion is unlikely to be justified under a properly nuanced *Rowland* duty analysis.

4

Nor do I agree with the majority that the same rule necessarily applies to all nonminimal "precautionary medical safety measures." (Maj. opn., *ante*, at p. 33.) To be sure, the *Rowland* factors are correctly applied to a *category* of allegedly negligent conduct rather than to the conduct of the particular defendant in the case at bar (*Cabral*, *supra*, 51 Cal.4th at pp. 772-774), but the category should be framed in a manner that allows for meaningful analysis of the factors. The issue in this case is whether large retailers have a duty to install and maintain AEDs, not whether businesses in general have a duty to take precautionary safety measures in general. The latter would be too broad for meaningful analysis.

For these reasons, I concur in the majority's result but not in the entirety of its analysis.

WERDEGAR, J.

5