AARON, J., Dissenting.
I agree with the majority that Verdugo v. Target Corp. (2014) 59 Cal.4th 312, 173 Cal.Rptr.3d 662, 327 P.3d 774 ( Verdugo ) provides the appropriate analytical framework for resolution of this appeal. However, I would conclude that that Respondent is clearly a health studio within the meaning of Health and Safety Code section 104113, subdivision (h), and that a proper application of Verdugo demonstrates that, in view of the statutory mandates applicable to health studios with respect to the acquisition of automatic external defibrillators (AEDs) and the training of health studio employees in the use of AEDs, such entities have a common law duty to reasonably use such devices in a medical emergency.
The majority states that it "evaluate[s] Appellants' challenge to the grant of summary judgment to Respondent in light of the analytical guidance provided by Verdugo ." (Maj. opn., ante , at p. 594.) In applying Verdugo , the majority concludes that Respondent's common law duty of reasonable care to patrons who suffer injury or become ill on its premises to provide first aid assistance does not include a duty to use an AED to assist "an adult ... having an on-site medical emergency that appears to be sudden cardiac arrest, while the adult is a permissive user of the facility whose group rented an outdoor portion of Respondent's sports facilities ...." (Maj.
*616 opn., ante , at pp. 592-93, 615.) In reaching this conclusion, the majority asserts that "there is no principled basis to determine that additional duties, beyond those required by statute, exist for a sports facility operator to compel its employees to utilize and apply those AEDs provided on the premises, on pain of liability." (Maj. opn., ante , at p. 613.)
In reaching this conclusion, the majority analyzes the issue as if the YMCA were not a health studio, but rather, merely a business that is open to the public. In this regard, the majority asserts that the parties "have not pointed to anything in this record clearly establishing that when Respondent acquired and maintained five AEDs, it was doing so as a health studio that had to comply with the statutory requirements of [Health and Safety Code] section 104113."[1] (Maj. opn., ante , at p. 604.) However, there can be no serious question that Respondent is a health studio within the meaning of section 104113, subdivision (h). That statutory provision defines a "health studio" as "a facility permitting the use of its facilities and equipment or access to its facilities and equipment, to individuals or groups for physical exercise, body building, reducing, figure development, fitness training, or any other similar purpose, on a membership basis." ( § 104113, subd. (h).) As the majority notes, "It is not disputed that Respondent carries out many exercise-related activities on its indoor and outdoor premises, and in many of them, it presumably is acting toward its members as a 'health studio' for purposes of the definition in section 104113, subdivision (h)." (Maj. opn., ante , at p. 603.) Yet, in its analysis of whether a common law duty exists on the part of Respondent to use an AED under the circumstances of this case, the majority entirely disregards the reality that the YMCA, in its day to day operations, is a health studio and that as such, it has statutory duties, as well as statutory immunities, with respect to the use of AEDs.
As a health studio, Respondent has a statutory duty to "acquire, maintain, and train personnel in the use of, an automatic external defibrillator [ AED] ...," to have trained employees available to respond to an emergency that may involve the use of an [AED] unit during staffed operating hours, and to have a written plan describing the procedures to be followed in the event of an emergency that may involve the use of an AED. ( § 104113, subds. (a), (e)(2)(D), (E).)[2] These statutory duties *617 must be taken into account in assessing whether Respondent's common law duty of reasonable care to its patrons includes a duty, in appropriate circumstances, to use an AED in the event of a medical emergency. ( Verdugo , 59 Cal.4th at pp. 334-335, 173 Cal.Rptr.3d 662, 327 P.3d 774.)
In Verdugo , the issue before the court was whether, under California law, the common law duty of reasonable care that the defendant, Target Corporation (Target) owed to its customers included an obligation to obtain and make available on its business premises an AED for use in a medical emergency. The Verdugo court specifically recognized that although "the [relevant] legislative enactment ... was not intended, and may not be construed by California courts, to require a building owner or manager to acquire and install an AED in any building, the subdivision in question [subdivision (f) ] does not purport to address the separate and distinct question whether, and if so under what circumstances, California common law may embody a duty to acquire and make available an AED as part of the general common law duty of care owed by a business establishment to its patrons or customers." ( Verdugo , 59 Cal.4th at p. 326, 173 Cal.Rptr.3d 662, 327 P.3d 774, second italics added.)
In rejecting Target's argument that the enactment of Health and Safety Code section 1797.196, which provides that "[n]othing in this section or Section 1714 .21 of the Civil Code may be construed to require a building owner or a building manager to acquire and have installed an AED in any building," precluded recognition of a common law duty on the part of Target to provide an AED for use by its customers, the Verdugo court criticized an analogous assertion made by the Court of Appeal in Breaux v. Gino's , Inc. (1984) 153 Cal.App.3d 379, 200 Cal.Rptr. 260 ( Breaux ). In Breaux , the decedent, a customer at a restaurant owned and operated by respondent, choked while eating. An assistant manager called for an ambulance as soon as he became aware that the customer was in distress. No one attempted to administer first aid to the choking customer. It was undisputed that respondent had "complied with [then existing] Health and Safety Code section 28689 by posting in an appropriate place the state-approved first aid instructions for removal of food which may become stuck in a person's throat." ( Id. at p. 381, 200 Cal.Rptr. 260.) Observing that "[i]t is well established that restaurants have a legal duty to come to the assistance of their customers who become ill or need medical attention and that they are liable if they fail to act," ( id. at p. 382, 200 Cal.Rptr. 260 ) the Breaux court addressed what physical acts restaurants and their personnel are required to perform. The court noted that in Health and Safety Code section 28689, the Legislature had established standards for restaurants' actions with respect to patrons who have food stuck in their throats, quoting the portion of the statute that stated that "... [n]othing in this section shall impose any obligation on any person to remove, assist in removing, or attempt to remove food which has become stuck in another person's throat." ( Ibid. ) The appellate court concluded that this statute established "as a matter of law that a restaurant meets its legal duty to a patron in distress when it summons medical assistance within a reasonable time, " and that the respondent had met its duty to the decedent by summoning an ambulance promptly. ( Ibid . )
*618 Noting that " ' "[t]here is a presumption that a statute does not, by implication, repeal the common law," ' " the Verdugo court rejected the Breaux court's assertion that the Legislature had resolved the question of the nature and extent of a restaurant's duty with respect to patrons who have food lodged in their throats through the then-existing language in Health and Safety Code section 28689. The Verdugo court stated,
"[T]he fact that the statutory provision at issue in Breaux specified simply that nothing in the statute imposed an obligation to remove or attempt to remove food which has become lodged in a customer's throat was not itself sufficient, in our view, to preclude a court from determining whether, under generally applicable common law principles, such a duty should properly be recognized under the common law. The court in Breaux failed adequately to consider the common law as an alternative source of potential tort duty or liability, distinct and independent of any statutorily imposed requirement." ( Verdugo , 59 Cal.4th at p. 331, 173 Cal.Rptr.3d 662, 327 P.3d 774.)
The Verdugo court recognized that in addition to any statutory duty owed to its customers, a restaurant's common law duty of reasonable care might include, "either in general or in light of a special risk of choking that might be posed by particular foods or the frequency at which such choking may have occurred at the establishment, an obligation to take reasonable steps to attempt to dislodge an obstructing particle of food from a choking customer." ( Verdugo , 59 Cal.4th at p. 330, 173 Cal.Rptr.3d 662, 327 P.3d 774.)
Just as a restaurant may, under appropriate circumstances, have a common law duty to attempt to dislodge food from the throat of a choking patron, a health club?a type of establishment at which, as the Legislature has recognized, there is a heightened risk of a patron suffering sudden cardiac arrest ?may very well have a common law duty, in appropriate circumstances, to use an AED in a medical emergency.
The Verdugo court made clear that in determining whether a defendant has a common law duty to take some particular action with respect to AEDs, a court should carefully analyze the existing statutory framework to assess the relevant policy considerations that impact such a determination. ( Verdugo , supra , 59 Cal.4th at pp. 334-335, 173 Cal.Rptr.3d 662, 327 P.3d 774 ["Although ... we conclude that the current California statutes do not preclude courts from determining whether a common law duty to acquire and make available an AED (either in general or in particular circumstances) should be recognized, it should be emphasized that this does not mean that in considering whether such a common law duty should be recognized, courts should not take into account the existing California AED statutes insofar as such statutes bear on the relevant policy considerations that affect that determination"].) Existing California AED statutes require health studios to acquire AEDs and to train their employees in their use. ( § 104113, subd. (a).) The AED statutes also provide immunities for the use or non-use of AEDs in medical emergencies by health studio employees when the health studio is in compliance with the requirements of section 104113. ( § 104113, subd. (d).) These statutory provisions evince a clear legislative intent to strongly encourage the use of AEDs by health studio employees in the event of a medical emergency.
In determining the scope of the common law duty on the part of a business to provide reasonable aid to its patrons who *619 suffer a medical emergency on its premises, a court must determine: 1) whether the risk of the particular medical event to be guarded against is foreseeable in light of the nature of the activities performed at the defendant's business; and 2) whether requiring a particular safety measure would be unduly burdensome . (See Verdugo , supra , 59 Cal.4th at p. 338, 173 Cal.Rptr.3d 662, 327 P.3d 774 [examining "(1) the degree of foreseeability that the danger will arise on the business's premises and (2) the relative burden that providing a particular precautionary measure will place upon the business"].)
In view of the nature of the activities engaged in by patrons of health studios, it is eminently foreseeable that a patron of such a facility may suffer sudden cardiac arrest while using the facilities of the club. This foreseeable danger is plainly the reason why "[h]ealth studios are currently the only nonmedical setting in which California statutes or regulations require that AEDs be provided." ( Verdugo , supra , 59 Cal.4th at p. 324, 173 Cal.Rptr.3d 662, 327 P.3d 774, italics added.)[3]
Given the statutory mandates applicable to health studios with respect to AEDs, establishing a common law duty for health studios to use an AED in a medical emergency involving cardiac arrest would impose a minimal incremental burden. In addition, the consequences to the community of imposing a duty to use an AED would be minimal since owners, managers, employees and "otherwise responsible authorities of the facility" are granted broad statutory immunity for the use or nonuse of an AED to render emergency care or treatment, as long as the facility is in compliance with other provisions of section 104113. ( § 104113, subd. (d).) Thus, imposing a common law duty on health studios to use an AED in a medical emergency would constitute a minimal burden to guard against this highly foreseeable risk.
I would conclude that a proper application of Verdugo establishes that as part of its duty to take reasonable action to protect or aid patrons who sustain an injury or suffer an illness while on the business's premises, Respondent, as a health studio, has a duty to deploy and use an AED on a permissive user of its facilities, in appropriate circumstances, in the event of a medical emergency. I would therefore reverse the grant of summary judgment.

All further statutory references are to the Health and Safety Code unless noted. Section 1797.196, subdivision (b) provides that when an entity acquires an AED to ensure public safety, it shall comply with applicable regulations governing placement, maintenance and testing of the device, and make appropriate notifications to officials and to tenants that the device is present at the site. Section 1797.196, subdivision (f) states that the section, in combination with Civil Code section 1714.21, does not impose a mandatory duty to obtain AEDs.

Unless otherwise specified, all subsequent statutory references are to the Health and Safety Code.

The record demonstrates that the YMCA clearly viewed itself as a health studio. As required by section 104113, the YMCA acquired and maintained five AEDs and trained its employees in their use. Further, the YMCA of the USA's Medical Advisory Committee Recommendations state that an "on-site emergency response plan is required that includes use of an AED for early defibrillation." In addition, Respondent's Administrative Manual states that "[b]ranches must update their emergency procedures to include the use of the AED," and that YMCA staff must activate the branch Emergency Procedures and provide prompt basic life support "including AED and first aid." The Administrative Manual further states that an AED "should be used on any person who is at least 1 years of age and displays ALL the symptoms of cardiac arrest," and goes on to state that the AED is to be used only after it is confirmed that the person is unconscious, not breathing, and has no pulse and shows no signs of circulation such as normal breathing, coughing or movement. Finally, the East County Family YMCA's Youth and Adult Sports Staff Manual (the facility involved in this case) provides that an "AED must be checked out every time we have an outdoor clinic, practice, class, game, or rental for both youth and adult sports," and that "[e]ach sports staff working outside the facility (i.e. on the softball field and soccer arena) is required to take a first aid kit and AED with them in the event of an emergency."

The majority effectively concedes that there is a higher risk of sudden cardiac arrest to participants in sports or exercise activities at a health studio than to members of the public in general, stating that even if the foreseeability factors set forth in Rowland v. Christian (1968) 69 Cal.2d 108, 113, 70 Cal.Rptr. 97, 443 P.2d 561, weigh in favor of a duty of care in this case, courts " 'must also consider whether public policy requires a different result.' " (Maj. opn., ante , at p. 614, quoting Regents of University of California v. Superior Court (2018) 4 Cal.5th 607, 631, 230 Cal.Rptr.3d 415, 413 P.3d 656.)