Filed 5/5/2025

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| MARK TILLINGHAST,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>LOS ANGELES UNIFIED<br>SCHOOL DISTRICT,<br><br>　　　Defendant and Appellant. | B332299<br><br>Los Angeles County<br>Super. Ct. No. BC669592 |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County, H. Chester Horn, Jr., Judge.  Affirmed.

　　　Huarte Appeals, Anne M. Huarte for Plaintiff and Respondent.

　　　Artiano Shinoff, Paul V. Carelli, IV for Defendant and Appellant.

_____

　　　Maxwell Tillinghast collapsed at Palms Middle School.  The 911 operator asked if the school had a defibrillator.  Teachers desperately trying to resuscitate the 13 year old said no.  In fact,

the school did have one.  It was in the main office, but no one ever told the teachers.  Tillinghast would have had a 90% chance of survival if defibrillated within three minutes.  Without the defibrillator, Tillinghast died.

The school had the equipment to save Tillinghast's life.  Teachers were trained to use it.  They just did not know it was there.

The jury awarded Tillinghast's father $15 million for the preventable loss of his son.  The school district appeals.

We affirm.  The sole issue at trial was the factual question of causation:  whether Tillinghast's latent heart defect would have led to a fatal outcome even had the teachers known about the nearby defibrillator.  This appeal concerns a different issue:  the legal question of whether the school district had a duty to inform the teachers.  The school district forfeited its complaints about this jury instruction issue by not raising the question at trial.  The verdict stands.

I

A teacher described Maxwell Tillinghast as "very quiet, polite, respectful."   He was tall and fit but had an unsuspected heart defect.  Tillinghast was jogging in a physical education class when he collapsed from sudden cardiac arrest.

Sudden cardiac arrest is a leading cause of death in the United States.  It is the abrupt loss of heart function in people who may or may not have heart disease.  A common cause is ventricular fibrillation, in which the heart's electrical impulses suddenly become chaotic.  This stops blood flow to the brain, causing the victim to collapse and lose consciousness.  The person usually dies unless a normal heart rhythm is restored within

minutes.  (*Verdugo v. Target Corp.* (2014) 59 Cal.4th 312, 319 (*Verdugo*).)

Yearly, as of 2013, emergency personnel in the United States treated over 300,000 victims of cardiac arrest before they reached the hospital.  Fewer than 10 percent of victims survived.  (*Verdugo, supra,* 59 Cal.4th at p. 319.)

A defibrillator can restore the heart's normal rhythm.  A victim's chance of survival decreases by seven to 10 percent for every minute that passes without defibrillation.  Small portable automated external defibrillators (AEDs) became commercially available in the 1990s.  These are highly accurate, user-friendly computerized devices with voice prompts guiding their use.  Manufacturers designed them for lay use to reduce time to defibrillation for victims suffering sudden cardiac arrest.  The rescuer turns on the defibrillator and attaches pads to the victim.  The device analyzes cardiac rhythm and, if appropriate, delivers the proper shock, sometimes without further action by the rescuer.  (*Verdugo, supra,* 59 Cal.4th at pp. 319–320.)

The American Heart Association began a national public health initiative in the mid-1990s to promote use of defibrillators.  The initiative included model legislation granting legal immunity under specified circumstances to entities making defibrillators available for emergency care.  Between 1995 and 2000, all 50 states enacted responsive laws and regulations.  (*Verdugo, supra,* 59 Cal.4th at p. 320.)

California enacted a defibrillator statute in 1999.  (Health & Saf. Code, § 1797.196 ("§ 1797.196" or "the defibrillator statute").)

The Los Angeles Unified School District, of which the Palms Middle School is part, promulgated a defibrillator policy

and bulletin in 2012.  The bulletin states that, "[i]f the shock is performed in less than 3 minutes from onset, there is a 90% chance of survival."  It also states "Trained personnel will use an AED on persons who are unconscious, not breathing, or gasping, and not exhibiting signs of circulation.  AEDs will be maintained on the premises of selected schools, and other locations in the Los Angeles Unified School District."

This defibrillator bulletin played a central role in the trial.  We return to it shortly.

When Tillinghast collapsed on the school's track on April 25, 2016, teachers began performing cardio-pulmonary resuscitation and phoned 911.  The teacher on the 911 phone call was trained to use a defibrillator.  He had worked at the school for more than a decade.  The 911 operator asked if the school had a defibrillator.   The teacher said no.  He did not know the school had a defibrillator in its main office.

School principal Dr. Derek Moriuchi started at this school in 2012.  Before Tillinghast's death, Moriuchi never knew about the defibrillator bulletin.  No one from the school district told him.  If someone at the school district had informed him about the bulletin, he would have followed its instructions and told the teachers about the defibrillator.  The first time Moriuchi learned about the defibrillator bulletin was when, after Tillinghast's death, he investigated on his own.  There were people at the school district who were supposed to pass the bulletin information on to Moriuchi.  But they did not.

Tillinghast's father sued the school district and five of its employees:  Moriuchi, three teachers on the scene of Tillinghast's collapse, and another person no longer in the case.  The father

4

later dismissed the three teachers, leaving the only two defendants as the school district and Moriuchi.

The operative complaint asserted four causes of action.

Tillinghast's first cause was for negligence under Government Code sections 820, 815.2, and 815.6. These sections make public *employees* liable for their own torts, and make public *entities* liable for some injuries caused by their employees or by the entities' breach of a mandatory duty.

The second cause of action was for negligence against Doe defendants that Tillinghast never added, which made count two moot. The third claim was for wrongful death based on the failure to have a nearby defibrillator. The fourth asserted wrongful death standing for Mark Tillinghast on behalf of his deceased son Maxwell.

Tillinghast's opening statement asserted "It was the district that dropped the ball rather than Dr. Moriuchi."

The school district's opening statement, by contrast, claimed causation was the sole trial issue. The district said Tillinghast's life "simply couldn't be saved." "An AED on this child would not have been effective because of the state of his heart." "Unfortunately mistakes were made at school in terms of notifying staff of the AED and giving them appropriate training, that's been conceded from day one by me at this trial. . . . [T]hose mistakes really had nothing to do with the reason why they couldn't get Max back up and running in terms of his cardiac condition. The abnormal heart presented an insurmountable obstacle to that."

The focus of the trial thus was a battle of medical experts. Tillinghast's experts testified that, had the teachers known about the nearby defibrillator, Tillinghast "would have survived." The

5

school district's experts said Tillinghast's heart defect was so severe that a defibrillator could not have saved his life.

In his closing argument, Tillinghast's attorney's central theme was that the school district "failed and that failure resulted in the unnecessary death of a young child." He emphasized the school district's bulletin, which stated that defibrillators were successful 90% of the time when used within the first three minutes.

"We're not suggesting or [implying] that the teachers are at fault. What we are saying is someone up in this chain of command failed to notify Dr. Moriuchi of this bulletin. And he told you himself, . . . had I known about it, I would have let the teachers know. . . . So someone, maybe his direct superior, maybe someone above him, maybe the superintendent of the schools, maybe the board, I don't know where, but somewhere along the line, someone failed to send that bulletin to this principal, and maybe others. And that's who's responsible. We don't have to identify that person directly. It's an LAUSD employee, not the teachers. When you deliberate and you go through [ ] the verdict form, when you hold that person accountable, it's not the teachers. It's that person. It's the LAUSD employee that failed to send the bulletin."

"[T]he evidence is resoundingly that LAUSD was responsible for the harm."

While urging the jury to find the school district liable, Tillinghast's attorney suggested the jury should exonerate Moriuchi. When going over the verdict form, this attorney said: "Was defendant Dr. Moriuchi negligent, our position is he was not, you can decide – I'm going to leave this blank because I think you should decide."

At length, Tillinghast's attorney analyzed the expert medical evidence.

The school district's closing argument began by again conceding that "[E]rrors were made and mistakes were made. And the biggest one probably is not letting staff know that there was an AED located in the school office. But that's not really what this case is about as the evidence has come in. Because the evidence has been pretty compelling that the use of an AED by a school staff would not have been effective. . . ."

The balance of the school district's closing focused on expert medical evidence that using a defibrillator would not have saved Tillinghast's life. The school district repeated that "the major issue in this case is the causation." "[A]n AED would not have made a difference in this case."

In rebuttal, Tillinghast's attorney said "That is the entire case. They're saying he was going to be dead anyway, AED or no AED."

The jury's verdict was the school district was negligent but Moriuchi was not. Damages totaled $15 million.

## II

The school district appeals by arguing the trial court "erred as a matter of law by giving CACI 423," which is entitled Public Entity Liability for Failure to Perform Mandatory Duty. The school district forfeited its objection to CACI No. 423 by failing to preserve the point in the trial court. We affirm.

## A

The school district forfeited objections to CACI No. 423.

By acquiescing in the instructions the court gave without requesting any additional instructions, a party in a civil case forfeits the right to argue on appeal that the court misinstructed

the jury.  Each side must propose complete and comprehensive instructions in accordance with its theory of the litigation.  Trial courts have no duty to seek out theories a litigant might have advanced, or to articulate what it leaves unspoken.  Where the court gives an instruction correct in law, but a party complains that it is too general, lacks clarity, or is incomplete, that party must request additional or qualifying language to have the supposed error reviewed.  The failure to request different instructions forfeits that argument on appeal.  (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130–1131.)

The district forfeited its complaints about CACI No. 423.

Months before the trial, on November 3, 2022, the parties had disagreed about CACI No. 423.  By the time the court instructed the jury, however, the parties had resolved their differences.

On the penultimate day of trial, on April 12, 2023, after the jury left the courtroom for its lunch break, the court said "Let's go over the jury instructions so we can be as ready as we can be for tomorrow."

In a collegial discussion, the parties went through all the jury instruction issues.  The school district spoke up freely when it had an objection or a comment.  This informal discussion progressed to CACI No. 423.

"The Court:  Okay.  We've already discussed the modifications that we're going to make to 4 – to [CACI No.] 423, striking the reference to sub paragraphs (B) and (C) in that instruction.

"[Plaintiff's counsel]:  Your honor, I printed a newer copy that reflects all of the changes we've discussed and removed the boxes.

8

"The Court:  Okay."

The discussion moved on to other matters.

*The school district did not object or seek to modify CACI No. 423.  That was forfeiture.*

After further collaboration on other instructions, Tillinghast's counsel said "This is the easiest jury instructions conference I've had."

On the next day of trial, April 13, 2023, the court and the parties had another cooperative discussion about jury instructions.  The group ironed out the remaining issues in another display of productive and professional civility.  *No one brought up CACI No. 423.*  At the conclusion of this final discussion of jury instruction, the court praised the parties:

"The Court:  All right.  Instructions look fine everybody, so good job."

The court then delivered the agreed version of CACI No. 423 together with the other instructions.  The school district did not object.

*This was forfeiture all over again.*

### B

The school district incorrectly argues the evidence was insufficient to support the verdict.  This argument is hopeless when the district conceded in its opening statement that "mistakes were made."  In closing, the district reiterated the point:  "Errors were made and mistakes were made.  And the biggest one probably is not letting staff know that there was an AED located in the school office."  Evidence supported the verdict.

A single valid theory of liability here suffices to support this verdict.  Tillinghast correctly notes the stipulated verdict form did not ask the jury to distinguish between negligence based

on breach of a statutory duty and negligence based on any other theory.  He aptly observes that, instead, the verdict form lumped all claims together "and asked the jury to generally decide two issues for liability:  negligence and causation, as to an employee of the District and as to Moriuchi."  We therefore do not reach the other issues in the case, as they are not necessary for our decision.

## DISPOSITION

We affirm the judgment and award costs to respondent.

WILEY, J.

We concur:

STRATTON, P. J.

SEGAL, J. *

---

*     Associate Justice of the Second District Appellate Court, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

10